## ROSWELL D. LYMAN

*v.*

## HENRY E. GEDNEY.

*Filed at Ottawa June 13, 1885.*

1. SPECIFIC PERFORMANCE—*where penalty for non-performance is provided.* The mere fact that a contract stipulates for the payment of liquidated damages in case of failure to perform, does not prevent a court of equity from decreeing a specific performance.

2. It is only where the contract stipulates for one of two things in the alternative,—the performance of certain acts, or the payment of a certain amount of money in lieu thereof,—that equity will not decree a specific performance of the first alternative.

3. DEDICATION—*by plat of a town.* A plat of a town laid out under the law of 1833 not having been acknowledged as required by that law, which shows a block marked "public square," was held not to have passed or conveyed any title to the public.

4. CANAL LANDS—*belonged to State.* The legal title to the canal lands granted by Congress to this State was not originally held by the canal trustees, but by the State itself, and such title was passed only by patents issued by the State and signed by the Governor.

5. SAME—*donations to and sales by counties.* Under the act of 1831 the canal commissioners were authorized to give lots in any county town laid out by them, not exceeding ten acres, to aid in the erection of public buildings, and the Governor was required-to issue patents therefor; and in case of any such donation, the county commissioners of Cook and La Salle counties were authorized to sell such lots so donated to them, respectively, when they might think best, and apply the proceeds to the erection of a court house and jail in each county seat.

6. In this case the canal commissioners, in 1837, laid out and platted the town of Ottawa, in La Salle county, but the plat was not acknowledged, as required by the law then and since in force. Upon the plat, block 11 was divided into eight lots, and across the block were written the words, "public square." The State issued its patent to La Salle county for lots 1 to 8, inclusive, of block 11, after which the county commissioners sold and conveyed lots 1 and 2 of the block to private persons, which sales were, in 1841, ratified by the State legislature: *Held,* that the legal title, by these several acts, was vested in the grantee of the county, and the public had no longer any right or title to such lots.

7. CONSTITUTIONAL LAW—*power of legislature to sell public property.* In the absence of constitutional restriction the legislature may authorize pub-

lic property, or property held by the State, to be sold and conveyed to private individuals, where no trust in favor of private individuals stands in the way.

8. SAME—*when private rights prevent sale of public property.* Where a private individual conveys property to the public for a specified use, or where the public authorities plat and lay off grounds as dedicated to a public use, and sell other adjacent property on the faith of such public use remaining, and in consideration of its benefits to the property sold, it seems that such property so dedicated to the public can not afterwards be sold to private persons, to the detriment of those who purchased in consideration of the donation. But a person buying a lot around a public square after the sale of one or more lots therein, can not be heard to complain, nor can any one else, after the lapse of fifty years.

9. Although it may have been once doubtful as to the right of county commissioners to sell a portion of the lots in a block marked "public square," yet if such a sale is acquiesced in by the public authorities and private persons interested, for the period of fifty years, all persons will be estopped to question the validity of such sales as against the private rights of those claiming under the purchase.

10. CONVEYANCE—*as showing equitable outstanding title.* In 1851 the vendor of land made a conveyance of the same to an assignee of his three vendees, A, B and C, in which the making of the contract of sale to A, B and C, and its assignment to the grantee, were recited. It was objected, that as the assignment by one was by an attorney in fact, it was bad, because the power was not acknowledged, and because a wife of one of the vendees had an equity that did not pass by the assignment: *Held*, that as the legal title passed alone by the original vendor's deed, no acknowledgment to the power of attorney was necessary to the assignment of the contract, and as the property had been held for thirty years, the deed must be held as sufficient to pass the title.

11. SAME—*from a firm—presumption as to whether by all its members.* About forty years ago the owner of two lots conveyed them to a firm, (Cushman, Eaton & Co.) and the next deed in the chain of title was executed by W. H. Cushman and wife, Seth Eaton and wife, James M. Leonard and wife, and Benjamin Thompson and wife, to one N., but the deed did not recite that these persons constituted the firm named: *Held*, that such recital was not necessary; and it appearing Thompson was one of the firm, and no adverse claim ever having been interposed, it was also held that the proof was sufficient to show a conveyance from the firm, after the lapse of so great a time.

12. DOWER—*unreleased—no objection to title after dowress' death.* It was objected to a vendor's title to land, that the wives of two former owners failed to relinquish their dower; but it was *held*, that proof of their death prior to the sale obviated such objection; and so proof of the death of the husband of another dowress thirty years before, was held sufficient to show her dower was barred, and hence no incumbrance.

13. MORTGAGE—*satisfaction by one of two mortgagees, good.* Where a mortgage is given by a debtor to two persons, to secure the payment of a sum of money to them jointly, either one of them, on payment to him, may enter satisfaction of the mortgage upon the record thereof, and if he is dead, proof of his signature and that of the attesting witness will be sufficient to show satisfaction.

14. SAME—*extinguishment—deed to mortgagee.* Where the mortgagor conveys the mortgaged premises to the mortgagee and another, and the mortgagee afterwards conveys to that other, this will extinguish the mortgage.

15. PAYMENT—*to one of two payees.* Payment to one of two joint payees extinguishes the debt.

16. JUDGMENT—*satisfaction by attorneys.* A father conveyed land to his daughter on March 29, 1878, and on June 6, 1878, a judgment was recovered against him and another, upon which an execution was issued, and returned "no property found." On June 9, 1879, the father compromised with the plaintiff in the judgment, and on that day the attorney of record for the plaintiff gave a receipt in full, and entered satisfaction upon the margin of the record. On June 29, 1879, the daughter reconveyed to her father, and the title passed from him to one who sold the land, and his title was objected to as being subject to the lien of the judgment: *Held,* that the purchaser could not refuse to complete the purchase on this ground, and that the judgment never was a lien on the land.

17. VARIANCE—*decree without amending bill.* A bill by a vendor of land for a specific performance of the contract, alleged that the complainant was seized in fee of the premises which he agreed to convey, subject to the payment of a mortgage indebtedness in the agreement mentioned, and the taxes, and that they were free of all other incumbrances. The agreement described the indebtedness as "a certain mortgage in favor of G. R. and A. K., given to secure the sum of $4000," etc., and the deed tendered described the mortgage in the same way. The evidence showed the existence of a mortgage to A. K., to secure $2500, due in four years, and $1500, due in three years. The decree found the mortgage debt correctly: *Held,* that the complainant technically should have amended his bill, averring the mistake in the description of the mortgage assumed; but as the correct amount of the incumbrance appeared both in the pleadings and proof, the error was not of such importance as to justify a reversal of the decree.

18. TENDER—*of deed, when rendered unnecessary.* Where the purchaser of land announces his intention to the vendor not to comply with his contract before bill filed against him for a specific performance, no tender of a deed to him will be necessary; and it will be no defence that before suit the vendor tendered him one which failed to describe the premises with sufficient accuracy.

19. DESCRIPTION *in deed—by reference to prior deed.* A contract for the sale of real estate, after attempting to describe a part of the lot, con-

tained the following clause: "Also a strip of ground ten feet wide, extending along the east end of said strip of ground, being the same piece of ground described in the deed to the party of the first part," which described the land properly: *Held*, that in so far as the contract referred to the deed to the vendor, and in effect adopted the description therein, no rectification of the contract was necessary.

20. SAME—*of land—evidence for purpose of rectifying a contract for mistake.* Where a mistake occurs in the description of land in a written contract of sale, a prior instrument written in pencil, evidencing the contract, is competent evidence to show the mistake in the more full and formal agreement afterwards entered into.

21. SAME—*controlling words.* An agreement in pencil, for the sale and exchange of real estate, described the land that one party was to convey to the other, as the "N. ½ of the N. ½ of lot No. 2, in block 11, * * * and a piece of ground 10 by 40 in rear thereof, on following terms, (namely, known as the Cook & Glover block:)" *Held*, that the words, "Cook & Glover block," were the controlling descriptive words, that the block was a fixed and permanent monument, and that any words repugnant to such description were to be rejected.

22. PAROL EVIDENCE—*to explain latent ambiguities, and identify premises conveyed.* There is no doubt but that latent ambiguities in the description of premises in deeds, etc., may be explained by parol evidence, and that such evidence may be resorted to for the purpose of identifying the premises and applying the calls of the deed, in suits for the rectification and specific performance, and in other proceedings affecting title.

23. SPECIFIC PERFORMANCE—*when party estopped from taking advantage of a want of strict performance.* Where the vendee of land, before the time fixed for the vendor to make him a conveyance, repudiates the contract, and refuses to accept the deed tendered to him, not on account of any objection to its form or substance, he will be estopped, in equity, from setting up in defence to a bill for specific performance, that time was of the essence of the contract, and a failure to tender a sufficient deed within the required time.

24. EVIDENCE—*of ability to assign insurance policies.* On bill for the specific performance of a contract for the sale and exchange of city property, where the complainant was to have certain policies of insurance on the buildings held by him assigned to the defendant, who repudiated the contract, the evidence showed that the insurance agent consented to the transfers: *Held*, that in the absence of proof to the contrary, it would be presumed the agent was willing to make the necessary indorsements of consent to their transfer.

APPEAL from the Circuit Court of La Salle county; the Hon. GEORGE W. STIPP, Judge, presiding.

Messrs. SNOW & STEAD, and Mr. E. C. SWIFT, for the appellant:

A bill for specific performance is addressed to the discretion of the court, and may be denied, unless equity demands relief. *Rust* v. *Conrad*, 47 Mich. 454; *Seymour* v. *Delancy*, 6 Johns. Ch. 222; *Underwood* v. *Hithcox*, 1 Ves. Sr. 279; Adams' Eq. 83; Fry on Specific Per. 48; 2 Sedgwick on Damages, 422; *Frisby* v. *Ballance*, 4 Scam. 299; *Goss* v. *Jones*, 73 Ill. 508; *Race* v. *Weston*, 86 id. 95.

The agreement must not only be legal, but perfectly fair, and have been entered into without misrepresentation, misapprehension or oppression. *Frisby* v. *Ballance*, 4 Scam. 299; Kerr on Frauds and Mistake, 337; *Cadman* v. *Horner*, 18 Ves. 10.

The contract provides for the payment of $1000 as liquidated damages for non-performance, and the parties are bound by it. *Peine* v. *Weber*, 47 Ill. 47; *Gobble* v. *Linder*, 76 id. 159; *Reeves* v. *Stipp*, 91 id. 610; 2 Greenleaf on Evidence, sec. 259; Field on Damages, 154.

Appellee's title not being free from suspicion, appellant was not bound to take it. *Brown* v. *Cannon*, 5 Gilm. 174.

Block 11 having been dedicated for a public square, the county commissioners had no power to sell the lots therein to private persons. *Augusta* v. *Perkins*, 3 B. Mon. 437.

As to what constitutes a dedication to public use, and the evidence thereof, see *Godfrey* v. *City of Alton*, 12 Ill. 29; *Waugh* v. *Leach*, 28 id. 488; *Alvord* v. *Ashley*, 17 id. 363; *Rees* v. *Chicago*, 38 id. 322; *Field* v. *Carr*, 59 id. 200; *Stone* v. *Brooks*, 35 Cal. 489; *Noyes* v. *Ward*, 19 Conn. 268; *Smith* v. *State*, 3 Zabr. 712; *Aiken* v. *Lithgoe*, 7 Rich. 435; *Mayo* v. *Murchie*, 3 Munf. 358; *Cincinnati* v. *White*, 6 Pet. 431.

The block having been devoted to a public use, and held in trust for that use, no act of the legislature could authorize or ratify sales of lots in violation of the trust. *Franklin County* v. *Lathrop*, 9 Kan. 453; *Augusta* v. *Perkins*, 3 B. Mon. 437;

*Alton* v. *Transportation Co.* 12 Ill. 38; *Ransom* v. *Beal*, 29 Iowa, 69; *Still* v. *Lansingburgh*, 16 Barb. 107; *Warner* v. *City of Lyons*, 22 Iowa, 351; *Pomeroy* v. *Mills*, 3 Vt. 279; *Commonwealth* v. *Rush*, 2 Harr. 186; *Commonwealth* v. *McDonald*, 16 S. & R. 390; *Philadelphia* v. *Railroad Co.* 58 Pa. St. 253.

The title must be free from suspicion before the purchaser will be required to specifically perform. 1 Sugden on Vendors, 577; 3 Parsons on Contracts, 381; *Seymour* v. *Delancy*, 6 Johns. Ch. 233; *Richmond* v. *Gray*, 3 Allen, 25; *Tingley* v. *Cutler*, 7 Conn. 291; *Allen* v. *Atkinson*, 21 Mich. 351; Fry on Specific Per. secs. 573, 579, 580, 583.

Where the Statute of Frauds is pleaded, a written contract, no matter what may be the proof of fraud or mistake, can not be reformed on parol proof, so as to make it pass a larger interest in land than appears on its face. 2 Wharton on Evidence, secs. 905, 1024; Browne on Fraud, sec. 411; Fry on Specific Per. secs. 514, 520; Waterman on Specific Per. sec. 254, and note 1, p. 347; 5 Wait's Actions and Defences, 798; *Higginson* v. *Clowes*, 15 Ves. 506; *Glass* v. *Holbert*, 102 Mass. 24; *Elder* v. *Elder*, 10 Me. 80; *Climer* v. *Hovey*, 15 Mich. 8.

Time being of the essence of the contract, the failure to tender a proper deed in time is fatal to the relief sought. 3 Parsons on Contracts, *386; *Bodine* v. *Glading*, 21 Pa. St. 50; *Kemp* v. *Humphreys*, 13 Ill. 573.

Mr. C. B. CHAPMAN, and Messrs. MAYO & WIDMER, for the appellee:

A contract just and fair will be specifically enforced, notwithstanding the law gives a remedy by damages. *Rogers* v. *Saunders*, 16 Me. 92; *Hetfield* v. *Willey*, 105 Ill. 286; Story's Eq. Jur. sec. 751; Adams' Eq. *83; Bispham's Eq. sec. 371; *Chase* v. *Beal*, 20 Ga. 143; *Foss* v. *Haynes*, 31 Me. 81.

Possibility of dower in the land is not an incumbrance. *Bostwick* v. *Williams*, 36 Ill. 65; *Powell* v. *Monson Co.* 3 Mason, 355; *Mathison* v. *Wilson*, 87 Ill. 51.

The provision for the payment of $1000 for a breach of contract is no bar to relief by specific performance. *Broadwell* v. *Broadwell*, 1 Gilm. 599; 1 Sugden on Vendors, p. 334, sec. 57; 1 Story's Eq. Jur. sec. 715.

The evidence must be clear, either of an actual intent to dedicate, or of such acts or declarations as will equitably estop the owner from denying such intent. *Kelly* v. *Chicago*, 48 Ill. 388; *McIntyre* v. *Storey*, 80 id. 127; *Fisk* v. *Havana*, 88 id. 209.

After such lapse of time no court would dispossess the present owners. *Railroad Co.* v. *Joliet*, 79 Ill. 25; *Peoria* v. *Johnston*, 56 id. 51; Dillon on Mun. Corp. secs. 528, 529, note 1.

Payment of a mortgage debt to one of two joint payees discharges the debt, and extinguishes the mortgage. *Harding* v. *Parshall*, 56 Ill. 219; 1 Hilliard on Mortgages, 306.

No objection being made to the form of the deed tendered, it comes now too late. Readiness and willingness to perform was sufficient. *Mathison* v. *Wilson*, 87 Ill. 51.

After refusal to perform, no tender of any deed was necessary. *Boston* v. *Nichols*, 47 Ill. 353.

Any description adopted in a deed by which the premises intended to be conveyed may be established or identified, is sufficient. *Smith* v. *Crawford*, 81 Ill. 299.

As to reforming contract for mistake by parol evidence, and then decreeing a specific performance, see 3 Greenleaf on Evidence, p. 385, sec. 363; *Ballance* v. *Underhill*, 3 Scam. 453; *Willis* v. *Henderson*, 4 id. 13; *Broadwell* v. *Broadwell*, 1 Gilm. 579; *Insurance Co.* v. *Jones*, 87 Ill. 199; *McCormack* v. *Sage*, id. 485; *Hunter* v. *Bilyen*, 30 id. 228; *McLennan* v. *Johnston*, 60 id. 356.

Time was not of the essence of the contract. *Corbus* v. *Teed*, 69 Ill. 205; Bispham's Eq. sec. 391; *Kercheval* v. *Snape*, 6 T. B. Mon. 362; *Magoffin* v. *Holt*, 1 Duv. 95; *Williston* v. *Williston*, 41 Barb. 635; *Kemp* v. *Humphreys*, 13 Ill. 573.

Mr. JUSTICE SCHOLFIELD delivered the opinion of the Court:

This was a bill for the rectification and specific perform-
ance of an agreement to exchange and convey certain real
estate in the city of Ottawa. The court below decreed in
conformity with the prayer of the bill, and the case is brought
here by the appeal of the defendant.

After some preliminary discussion, which was protracted,
the parties signed an agreement, written in pencil, as follows:

"H. E. Gedney agrees to convey to R. D. Lyman, by Sept. 1,
the N. ½ of the N. ½ of lot No. 2, in block 11, by good and
sufficient warranty deed, subject to mortgage of $4000, to
Geo. R. and A. 'Keep, with interest accruing thereon from
July 11, 1883, and a piece of ground 10 by 40 in rear thereof,
on following terms, (namely, known as the Cook & Glover
block): Lyman is to pay Gedney $8500, in cash or mort-
gages, by Sept. 1, 1883; also, to convey by good title the two
lots of ground known as the Geo. H. Norris or Hickling prop-
erty, being a two-story brick house, standing, etc., on lots 5
and 6, block 2, Walker's add. to Ottawa. Gedney is to have
the use of all rents of property on the N. ½ of the N. ½ of
lot 11, in block 11, till Nov. 1, 1883; also, to have use of
Norris or Hickling property by Sept. 1, 1883. Gedney is to
transfer to R. D. Lyman on Nov. 1, 1883, all his insurance
policies on the three-story brick building conveyed to him,
amounting to not less than $10,000, by renewing for one year
any policies expiring before Nov. 1, 1883; and Lyman is to
assign to Gedney his insurance policy amounting to ......
on the Norris or Hickling property. Gedney and Lyman
bind themselves in the sum of 1000 dollars, as liquidated
damages, to fulfill above agreement.

"Witness our hands this 24th day of Aug., 1883.

H. E. GEDNEY,
R. D. LYMAN."

At the time of signing this, the parties mutually agreed that Duncan McDougal, an attorney at law, should draw up a more formal instrument, written in ink, evidencing the agreement, which they would sign on the next day. Accordingly, he drew up the following, which was subsequently signed by the parties:

"This agreement, made this 24th day of August, A. D. 1883, by and between Henry E. Gedney, of the city of Ottawa, in the county of La Salle, and State of Illinois, party of the first part, and R. D. Lyman, of the same place, party of the second part:

"Witnesseth, that if the party of the second part shall first make the payments and perform the covenants hereinafter mentioned on his part to be made and performed, the said party of the first part hereby covenants and agrees to convey by good and sufficient warranty deed, subject to a certain mortgage in favor of George R. and A. Keep, given to secure the sum of $4000, together with interest accruing thereon from July 11, 1883, which the party of the second part assumes and agrees to pay, the lots, pieces or parcels of land situated in the county of La Salle, and State of Illinois, known and described as follows, to-wit: the north half of the north half of lot two (2), in block eleven (11), in the original town (now city) of Ottawa; also, a strip of ground ten feet wide, extending along the east end of said strip of ground, being the same piece of ground described in the deed to the party of the first part. The party of the first part reserves the possession and accruing rents of said property until the 1st day of November, 1883, notwithstanding said conveyance may be sooner made without such reservations. The party of the first part further agrees to transfer to the party of the second part all insurance policies upon said property, to the amount of $10,000, at the time of the execution and delivery of said deed, and at his own expense renew, for the period of one year, any of said policies that may expire up to November 1,

1883. The party of the first part further agrees that his wife will join him in said conveyance, to the extent of relinquishing her dower right therein.

"The party of the second part covenants and agrees to pay the party of the first part the sum of $8500 in cash, or good notes and mortgages that are acceptable to the party of the first part, and convey to the party of the first part, by good and sufficient warranty deed, free and clear of all incumbrances, the following described lots, pieces or parcels of land situated in the county of La Salle, and State of Illinois, known and described as follows, to-wit: lots 5 and 6, in block 2, Walker's addition to the town (now city) of Ottawa, together with all and singular the appurtenances and privileges thereunto belonging or in anywise appertaining. The party of the second part agrees to assign and transfer, at the time of the delivery and execution of said deed, all the insurance policies then upon the property above described, known as the 'Norris or Hickling property.'

"It is mutually agreed by the parties hereto, that the several conveyances and payments above referred to shall be made on or before the first day of September next. The parties hereto further mutually bind themselves, respectively, in the penal sum of $1000, as liquidated damages, which they, respectively, agree to pay, each to the other, together with all other damages that may be sustained by either upon the failure of the other to comply with each and every one of the covenants herein contained.

"Witness our hands and seals the day and year first above written. H. E. GEDNEY,
R. D. LYMAN."

Lyman refused to perform his part of this agreement. A mistake occurred in the description of the property to be conveyed by Gedney. The decree below corrects that mistake, and then requires this contract to be specifically performed.

*First*—Counsel for appellant argue that the clause in the instrument written in pencil, whereby each party binds himself to the other in the sum of $1000, liquidated damages, limits the rights of the parties, upon a breach of the contract, in equity as well as at law, and that the only remedy is through an action at law for that sum; and they contend that the evidence shows that McDougal fraudulently added to that clause, as it is written in the last instrument, the words, "together with all other damages that may be sustained by either, upon the failure of the other to comply with each and every one of the covenants herein contained," and that he falsely represented to appellant that the legal effect of the clause was not changed by the addition of these words, and thereby induced appellant to sign the last instrument. The mere fact that a contract stipulates for the payment of liquidated damages in case of failure to perform, does not prevent a court of equity from decreeing specific performance. (Fry on Specific Performance, sec. 67, *et seq;* Waterman on Specific Performance, sec. 22; Pomeroy on Contracts, sec. 50.) It is only where the contract stipulates for one of two things in the alternative,—the performance of certain acts, or the payment of a certain amount of money in lieu thereof,—that equity will not decree a specific performance of the first alternative. Pomeroy on Contracts, *ubi supra;* Waterman on Specific Performance, secs. 22, 23 ; *Dooley* v. *Watson,* 1 Gray, 414.

We can not hold that the evidence shows that McDougal misled appellant with regard to the legal effect of the clause under consideration, without disregarding the ordinary rules relating to the construing and weighing of evidence. Appellant's evidence, alone, might authorize that view, but it is directly contradicted by the evidence of McDougal and Summers, two intelligent and apparently disinterested witnesses. They both testify that appellant was fully informed of the legal effect of the last contract before he signed it, and that he was expressly told that he could not be relieved from lia-

bility upon it by the payment of the $1000, and that it could be specifically enforced. His own version of his conduct is not very satisfactory. He admits that he signed the instrument with full knowledge of the language, but claims that he was persuaded thereto by McDougal. If, as he says, he was not then intending to perform the contract, but was only intending to pay the $1000, why did he sign the last instrument at all? He does not pretend that McDougal represented to him that the last instrument would be less onerous upon him than the first, if he did not intend to perform. He says, it is true, that McDougal called his attention to the fact that in the last instrument appellee was obligated to procure his wife to join with him in conveying to appellant, and represented that this would be worth $2000—to him. But that could only be upon the hypothesis that he should perform his contract. If he only intended to pay $1000, and let appellee keep his property, it is impossible that he could have supposed that obligation could be of any advantage to him. Plainly, both on the face of the instrument and on the evidence *aliunde*, the case is not one wherein specific performance should be refused, because the parties intended, at the time, that it should be optional to pay the $1000 or to make the conveyances and payment provided by the terms of the contract.

*Second*—Counsel for appellant contend that the property which appellee agreed to convey is a part of a public square dedicated by the commissioners of the Illinois and Michigan Canal when they laid out the original town of Ottawa, and that therefore the county commissioners had no power to convey it. The property is a part of lots 1 and 2, in block 11, in the original town (now city) of Ottawa. The land on which Ottawa was laid off was donated to the State of Illinois by the act of Congress approved March 2, 1827, subject to the disposal of the legislature, to aid "in opening a canal to unite the waters of the Illinois river with those of Lake Mich-

igan," by which act power was given the State to sell and convey the whole or any part of the lands so donated, and to give titles in fee. It is provided by section 3 of "An act to create and organize the counties therein named," in force January 15, 1831, that the permanent county seat of LaSalle county is thereby established at Ottawa, "as the same has been surveyed and laid out by the canal commissioners, on the north side of the Illinois river." And by section 10 of the same act, that "the public buildings at Chicago shall be erected on the public square, as laid off by the canal commissioners, on the south side of the Chicago river; and on the public square laid off at Ottawa, on the north side of the Illinois river." Parol evidence was introduced to the effect that in 1831, block 11, in the original town of Ottawa, was popularly designated as the public square. A plat was given in evidence showing block 11 designated "public square," as follows:

DUE EAST AND WEST LINE.

| 4 | 3 | 2 | 1 |

PUBLIC

11

SQUARE.

| 5 | 6 | 7 | 8 |

COLUMBUS STREET.

CANAL STREET.

And evidence was given of a certificate annexed to a plat of the town on which block 11 was thus designated, in these words:

"We, the undersigned, late commissioners of the Illinois and Michigan Canal, hereby certify that this map of the town of Ottawa is the identical map or plat by which we were governed in selling lots (belonging to the State) in the said town on the 26th day of September last past. The president of the board was absent at the time said lots were sold.

"Given under our hands, at Chicago, this 22d day of May, A. D. 1837.

W. B. ARCHER,
G. S. HUBBARD.

"Given under the hand and private seal of the secretary of the board of commissioners of the Illinois and Michigan Canal, no official seal being provided, at Chicago, this 29th day of May, A. D. 1837.

JOEL MANNING, *Sec'y.* [SEAL.]"

Counsel argue that these acts of the legislature, and this evidence of dedication, establish that block 11 was dedicated to public use as a public square.

The plat not having been acknowledged as provided by the statute of 1833, did not, of itself, convey title to the public as provided by that act. But, as we said in *Chicago* v. *Rumsey,* 87 Ill. 353: "The legal title was not held in the name of a trustee, but by the State; and the lots were conveyed by patent issuing from the chief executive officer of the State,—in all material respects similar to patents conveying lands from the general government." Moreover, it is provided by section 12 of the "Act to amend an act to provide for the construction of the Illinois and Michigan Canal," in force February 15, 1831, that "said commissioners" (*i. e.,* canal commissioners,) "are authorized, if they may be of opinion that it will increase the value of lots in any town laid off on the canal lands, that have or may become seats of justice, to give a quantity of lots in said town, not exceeding ten acres, to aid in the erection of public buildings, for which donation the Governor shall issue his patent as in other

26—114 ILL.

cases." The Governor did, here, issue his patent pursuant to this section,—not conveying block 11 for a public square, but conveying "lots 1, 2, 3, 4, 5, 6, 7 and 8, in block 11," together with other described property, "in the town of Ottawa, La Salle county, Illinois, to aid in the erection of public buildings." That property which is conveyed to aid in the erection of public buildings is intended to be sold and converted into money, would seem to be self-evident; but the General Assembly, unwilling to leave this to implication, by the 11th section of the "Act to create and organize the counties therein named," in force January 15, 1831, *supra,* explicitly enacted: "If the canal commissioners shall make any donations of lots for the erection of public buildings, at Ottawa or Chicago, to the county commissioners of said counties, it shall be the duty of the county commissioners' courts of each of said counties to sell the same whenever they may think it best, and apply the proceeds thereof to the erection of a court house and jail at said county seats, respectively."

Instead, then, of there being a donation of this block for a public square, the lots into which it is divided are donated to be sold to raise money with which to build a court house and jail. True, it is commanded that the public buildings shall be on the square, as laid off, etc., and, we may admit, on this square; but it is not commanded the whole block shall be devoted to that purpose, and construing the different sections together, and giving practical effect to both provisions, the commissioners were required to use what they should deem necessary for the public buildings, and sell and convey the residue, in order to realize money to erect these buildings. If any trust was created, it is by virtue of the section referred to authorizing the canal commissioners to make donation of the property, and the patent of the Governor pursuant thereto vesting title in the county commissioners; but this, as is thus seen, was only to aid in the erection of the buildings. But if this were doubtful, in our opinion all doubt is removed

by "An act in relation to the public square in the original town of Ottawa," in force February 23, 1841, (Laws of 1841, p. 311,) by the first section whereof it is enacted: "That all sales heretofore made by the county commissioners of the county of La Salle, of lots or parts of lots in block No. 11, in the original town of Ottawa, in said county, be and the same are hereby ratified and confirmed, and declared to be good and valid in law and equity, any act heretofore passed, or any map or record declaring or describing said block as a public square, to the contrary notwithstanding."

Counsel, however, insist that this act is unconstitutional, because it is attempted by it to take property from the public and vest it in private individuals. We know of no reason why, in the absence of constitutional restriction, (and nothing of that kind can be here claimed,) the legislature may not authorize public property to be sold and conveyed to private individuals, when no trust in favor of private individuals stands in the way. But counsel contend, and introduce authorities to sustain the contention, that there is, in this case, a trust in favor of private individuals. The cases cited establish that there may be a trust, in such cases, in favor of private individuals,—first, where a private individual conveys property to the public for a specified public use; and second, where the public authorities plat or lay off grounds as dedicated to public use, and afterwards sell other property, presumably benefited by such public dedication, with the understanding and upon the faith that such public dedication has been made. In the first case the grantor retains such an interest in the property as enables him to enforce the trust, and in the second case the grantee has a vested right in having the presumptive advantage to his property, with reference to which he bought. We have seen there was no private grant here. The State owned the property, and donated it to the county commissioners. The intervention of the canal trustees did not give the donation a private character. They were but the

agents of the State, and the title passed by the patent of the
Governor from the State to the county.    The evidence in this
record fails to show that other lots facing on the square were
purchased before the lots in the east half of the block were
sold, and hence it does not appear that there are any entitled
to claim that their rights were acquired upon the faith of an
implied undertaking that that part of the block should remain
perpetually open as a public square.    But even if there were
any such parties, they could not now be heard after having
remained so long silent, refusing or neglecting to assert their
claims.    This property was conveyed by the county commis-
sioners to Broomfield, September 4, 1832,—fifty-one years
before the present bill was filed.    The intention, moreover,
to dedicate the entire block to the public as and for a public
square, instead of donating so much of it as should be deemed
advisable to be sold to aid in building a court house and jail,
being, at least, not established beyond controversy, after the
acquiescence of those having authority to represent the public,
for this great length of time, in the sale and conveyance by the
county commissioners, they should now be estopped to ques-
tion the validity of that sale and conveyance.    The action of
the commissioners, and this long acquiescence therein, and
in the claims of those holding thereunder, should be taken as
circumstances conclusively settling the controversy, whether
the donation was for the one purpose or the other, in favor
of the private rights of those claiming under the purchaser,
and against the public.    A kindred principle was applied in
*Chicago, Rock Island and Pacific Railroad Co.* v. *City of Joliet,*
79 Ill. 25, and *City of Peoria* v. *Johnston,* 56 id. 51.

   *Third*—It is objected by appellant that in the deed of Cush-
man and wife to Glover & Cook, dated March 3, 1851, there
is a recital of a contract entered into between Henry Hurl-
but, Smith, and Alonzo Delano, which is assigned by Henry
Hurlbut, attorney in fact for Delano, and appellant intro-
duced the power of attorney for the purpose of showing that

it was not acknowledged, and hence invested Hurlbut with no power; and he also objected, at the same time, that there is no conveyance by the wife of Alonzo Delano of her interest in the property under this assignment. But it is enough to say that this is but the recital of a contract which was assigned to Glover & Cook, and which forms the consideration for the execution of the deed. The contract was simply assigned to Glover & Cook by the attorney in fact, and Cushman's deed passed the legal title to them. No acknowledgment of the power was necessary. There is not a particle of proof that any rights have ever been claimed by Delano or his wife under that contract, and it surely can not require the citation of authorities to establish that no rights could now be enforced by Delano or his wife thereunder, after having acquiesced in the assignment for more than thirty years, and after notice, for the same length of time, that the property had been conveyed to these assignees, and by them to others.

*Fourth*—Broomfield (who was grantee of the county commissioners) and his wife conveyed to Cushman, Eaton & Co. It is objected that the next deed under which appellee claims is executed by W. H. Cushman and wife, Seth Eaton and wife, James M. Leonard and wife, and Benjamin Thompson and wife, to George H. Norris, and that it is nowhere recited that these persons constituted the firm of Cushman, Eaton & Co. There is no necessity, of which we are aware, that this should be recited in the record. There is affirmative proof that Benjamin Thompson was a member of the firm of Cushman, Eaton & Co., and from the similarity of the names in both deeds, and the fact that these persons assume to have an interest to convey in the property, and that there is no proof that any one else has ever claimed adversely to this deed to Norris, as a member of that firm, we think the proof that the conveyance is by Cushman, Eaton & Co. to Norris, should be accepted as sufficient. Apart from this, the proof of an actual, exclusive possession by Norris, and

·those claiming under him, for a period of some forty years, is shown, which, of itself, is conclusive against any who might claim adversely under Cushman, Eaton & Co.

*Fifth*—The objection that Mrs. Thompson, Mrs. Sizer and Mrs. Alson Woodruff did not relinquish their dower, is answered by proof of their respective deaths many years since. And a like objection in regard to Mrs. Robert P. Woodruff is answered by proof of the death of Robert P. Woodruff in 1844, leaving intervening a much greater period of time than is necessary, under the statute, to bar any suit on her behalf for dower.

*Sixth*—The objection that the power of attorney whereby William Hickling was empowered to cancel mortgages, in the joint name of Walker and Hickling, did not empower him to cancel mortgages to George E. Walker and William Hickling, we incline to think is too technical; but waiving that, and conceding its insufficiency, the release on the margin of the record of the only mortgage affected by the objection, acknowledged the full payment of the mortgage, and was signed and sealed by William Hickling, one of the mortgagees, whose signature, as well as that of the attesting witness, was proven. The rule is, payment to one of two joint payees extinguishes the debt, (*Harding* v. *Parshall*, 56 Ill. 219,) and, of course, payment of the debt discharged the mortgage.

*Seventh*—Objection is urged that a mortgage made by Broomfield to Sizer, March 2, 1842, is not shown to have been satisfied; but it is proved that Broomfield, after executing the mortgage, conveyed the fee to Sizer, the mortgagee, and W. H. Cushman, and that Sizer subsequently conveyed to Cushman. That extinguished the mortgage. *Weiner* v. *Heintz*, 17 Ill. 262; *Shinn* v. *Fredericks et al.* 56 id. 439.

*Eighth*—It was in proof that appellee conveyed to Louie H. Dale, his daughter, on March 29, 1878; that she reconveyed to appellee on the 29th of June, 1879, and that a judgment was recovered against appellee, in favor of Selah Wait,

executor, etc., on the 6th of June, 1878, for $2491.63. Execution was issued on this judgment November 12, 1878, and returned January 4, 1879, "no property found on which to levy." On the 9th of June, 1879, appellee effected a compromise with the plaintiff in the judgment, and on that day the attorneys of record for the plaintiff gave him a receipt for $520, in full, etc., and indorsed on the margin of the record of the judgment, "Above judgment and interest paid in full, according to the terms and instructions of the plaintiff," which they signed. It will be observed this judgment has never been a lien, legally speaking, whatever might have been the equitable rights of the parties, upon the property here in controversy. The judgment was obtained after appellee had ceased to be the legal owner of the property, and it was satisfied of record before he was reinvested with the legal title. There is no evidence that any party interested in that judgment is or has been dissatisfied with the compromise and satisfaction of it, and although more than four years had elapsed after the entry of satisfaction before the making of the agreement of which specific performance was decreed in the present suit, no steps were taken to set aside the satisfaction. Under the evidence before the court, we think it quite clear that appellant can not be disturbed on account of that judgment, and that he can not be heard to urge anything in regard to it as an excuse for his failure to comply with his agreement.

*Ninth*—It is alleged in the bill, that at the time of making the agreement the complainant was seized in fee of the premises which he agreed to convey, subject to the payment of a mortgage indebtedness in said agreement mentioned, and to the taxes for the year 1883, and that the same are free of all other incumbrances. The mortgage indebtedness in the agreement mentioned is "a certain mortgage in favor of George R. and A. Keep, given to secure the sum of $4000," etc. The deed tendered describes the mortgage in the same

way. The evidence showed the existence of a mortgage to Augustus Keep to secure $2500, due in four years, and $1500, due in three years. It is contended the decree is not authorized—that the evidence does not sustain the allegations in the bill, in this respect. The decree finds "that the mortgage described in said agreement as a certain mortgage in favor of George R. and A. Keep, given to secure the sum of $4000, etc., payment of which was to be assumed by defendant herein, was a mortgage given by the complainant and wife to Augustus Keep, etc., to secure the payment of $2500, in four years, and $1500, in three years. Strictly and technically, appellee should have amended his bill, averring the mistake in the description of the mortgage assumed; but we can not say that it was such error to decree, as was decreed, without such amendment as would justify the reversal of the decree below. The substantial thing was the amount of the incumbrance which appellant assumed. Whether it was in one or more notes, or payable to one party or two parties, was mere matter of form, that could not substantially affect appellant. The amount was correctly stated in the agreement. It is proven there is no other mortgage on the property. The burden assumed, and the only burden which is chargeable against the property, is that described in the agreement,—a burden of $4000,—with interest thereon from July 11, 1883.

*Tenth*—The objection the deed tendered did not describe the property which it purported to convey, with sufficient accuracy, we regard untenable. Appellant having announced his intention to not comply with the contract before the bill was filed, no tender was necessary. (*Boston* v. *Nichols,* 47 Ill. 353.) Under the decree, appellee must execute a deed conveying the property, as provided by the terms of the contract, and the execution of the decree will be under the supervision of the court.

*Eleventh*—The point is made that, the Statute of Frauds being pleaded, it is not competent to decree a rectification

and specific performance of the contract, on parol evidence. The mistake in the description of the property in the written instrument occurred in this way: Lot 2, in block 11, is one hundred and fifty feet long, north and south, by eighty feet wide, east and west. The Cook & Glover block, which appellee undertakes to convey to appellant, occupies the north forty feet of the lot, which appellee by mistake assumed was one-half of one-half, or one-fourth of it, and hence, in the instrument, the block was, by mistake, described as the north half of the north half of the lot,—which, of course, is but thirty-seven and one-half feet, and leaves two and one-half feet occupied by the block, unconveyed. The balance of the description, in the instrument written in ink, is, after the words, "north half of the north half of lot 2," etc., "also a strip of ground ten feet wide, extending along the east end of said strip of ground, being the same piece of ground described in the deed to the party of the first part." The deed to the party of the first part is by Cook & Glover, and conveys "a strip of land ten (10) feet in width, east and west, and forty (40) in length, north and south, in the north-west corner of lot number one (1), in block number eleven (11), in the original town (now city) of Ottawa, Illinois,—the premises above described being situated immediately in the rear of said Henry Gedney's block of brick stores on lot numbered 2, in said block numbered 11, situated in the county of La Salle, in the State of Illinois." This description is free of objection, and inasmuch as the instrument refers to it, and, in effect, adopts it, no rectification of that much of the instrument is needed. *Smith* v. *Crawford*, 81 Ill. 299.

For the purpose of rectification, the instrument written in pencil is competent evidence. It describes the property which appellant undertakes to convey, thus: "N. ½ of the N. ½ of lot No. 2, in block 11, * * * and a piece of ground 10 by 40 in rear thereof, on the following terms, (namely, known as the Cook & Glover block.)" In effect, the Cook & Glover

block is conveyed, and a strip of ground ten by forty in the rear thereof. The words, "Cook & Glover block," are the controlling descriptive words. The block is a fixed and permanent monument, and under the well settled rules of construction applicable to conveyances, any words of description repugnant thereto, or inconsistent therewith, must be rejected. Without affirming or denying what may be the law in a case where rectification and specific performance rest entirely on parol evidence, there can be no question but that latent ambiguities may be explained by parol evidence, and that such evidence may also be resorted to for the purpose of identifying the premises and applying the calls of the deed, in suits for rectification and specific performance, and in other actions and proceedings affecting title. (*Cossit* v. *Hobbs*, 56 Ill. 231; *McLennan* v. *Johnston*, 60 id. 306.) By applying parol evidence to this description, it is proved that the north half of the north half of lot 2 is only thirty-seven and one-half feet, and that Cook & Glover's block occupies the north forty feet of the lot, and so, then, we must reject the description "north half of the north half" as repugnant to the other description or call in the deed, namely, "Cook & Glover's block," and, following that, hold that the contract is to convey the north forty feet of the lot.

*Twelfth*—To the objection that time was of the essence of the contract, and appellee did not tender a sufficient deed within the time, it is enough to say, appellant, by previously refusing to comply with the contract, is estopped from urging that objection. A deed was tendered within the time, which he would not receive or examine, and this, not because of any imperfection in the frame of the instrument, but because he had previously determined not to comply with the contract. The law did not require appellee to go through with a form which appellant had previously apprised him would be idle and useless.

*Thirteenth*—The objection that appellee misrepresented the condition of the property he was to convey, in respect to the water supply, is not sustained by the evidence. The evidence of appellant is squarely met and contradicted, in that respect, by the evidence of appellee and McDougal.

*Fourteenth*—The objection that the policies of insurance could not be assigned without the consent of the company indorsed thereon, and that such indorsement was not obtained, is, under the evidence, without merit. The insurance agent, the evidence shows, consented to the transfers, and we must assume, in the absence of evidence to the contrary, was willing to make the necessary indorsement. The objection, like several others, seems purely captious.

In conclusion, we can see no ground upon which we can assert that the court below erred, with such confidence as to warrant us in reversing the decree below. In view of the fact that by possession alone appellee's title to his property is unassailable, and clearly so, we do not think appellant was justified in acting on rumors current forty or fifty years before, that the interest of the public in the property had not been legally divested; and it is worthy of note that in respect of the many objections of incumbrances on the property, not a single instance is shown where one is threatened to be enforced. They are hunted up and magnified by the appellant as after-discovered excuses for a previous refusal to perform his contracts. In one or two aspects the case is a very close one,—so close that we are inclined to think we would not have reversed a decree either way. To some extent the chancellor had a discretion. We can not say that discretion has been abused.

The decree is affirmed.

*Decree affirmed.*