## John Skinner et al. v. J. C. Osgood.

1. GAMBLING—*What is Not an Option Contract.*—An agreement to buy 650 shares of stock in an incorporated company and pay for them at par on or before a given day, provided the party selling shall first notify the party buying, in writing, at his office in the city of New York, on or before a day named, of his election to sell said stock, is not an option contract within the prohibition of the statute.

Skinner v. Osgood.

2. Notice—*When Unnecessary.*—Where a party entitled to notice under a contract refuses to perform on his part on the ground that the contract is illegal, he waives the necessity of a notice under its provisions.

3. Contracts—*Construction—Intention of the Parties.*— When, from an examination of the writing itself, the intention of the parties can be clearly ascertained, a court of law will give effect to such intention.

**Assumpsit,** on a contract in writing. Trial in the Circuit Court of Cook County; the Hon. Edmund W. Burke, Judge, presiding. Finding and judgment for defendant; appeal by plaintiff. Heard in this court at the October term, 1898. Reversed and remanded with directions. Opinion filed June 29, 1899.

**Statement.**—A contract with appellants was entered into by appellee which is in the following terms:

" Memorandum of agreement made this 28th day of July 1890, by and between Emerson & Skinner, Dunfermline, Ill., and J. C. Osgood, acting on behalf of the Whitebreast Fuel Co. Emerson & Skinner agree to sell and convey to J. C. Osgood or his assigns, the following property: The Liverpool Railway Co., the mine and all equipment, material and supplies now owned and operated by them at Dunfermline, including the store building, miners' houses, etc.; the lease to 640 acres of land, between John Fisher and Emerson & Skinner; the sixty acres of land owned by Emerson & Skinner, west of the Liverpool Coal Railway; the stock of goods contained in Skinner & Emerson's store at Dunfermline; the rights to Leg mining machine for Fulton Co., Ill.; the mine right for the Harris mining machine. J. C. Osgood agrees to pay for the foregoing property as follows : $10,000 cash, on the execution of the papers hereafter referred to, and at the same time to give his two promissory notes, dated August 1, 1890, payable on or before one and two years from date respectively, for $12,500 each, with interest at six per cent per annum from date until paid, secured by mortgage on said mining equipment, leasehold, railway, and the sixty acres of land aforementioned, and transfer to Emerson & Skinner, or to such persons as they may direct, 650 shares of the par value of $100 each, of the full paid, non-assessable capital stock of the Whitebreast Fuel Co.; also to pay in addition for the transfer of the Leg mining machine rights, as aforesaid, the sum of $2,000 cash.

J. C. Osgood further contracts to pay for the stock of goods in store as soon as invoiced, the amount of such invoices at cost prices, with freight added. J. C. Osgood or his assigns are to be put in possession of the property aforesaid on August 1st, on or after which date it shall be operated for and under the direction of himself and his assigns. Emerson & Skinner agree as soon as practicable, not later than August 15, 1890, to assign and transfer the property aforesaid, by deed, bill of sale and assignment, sufficient to invest J. C. Osgood or his assigns with a full and uncontrolled title to said property. J. C. Osgood agrees to deliver to said Emerson & Skinner an agreement obligating himself to purchase from the said Emerson & Skinner the stock of the Whitebreast Fuel Co. as part consideration of their property, provided they elect to sell said stock, by written notice to him on or before August 1, 1891, and receive and pay for the said stock its par value on or before October 1, 1891.

It is understood that J. C. Osgood shall purchase from Emerson & Skinner, and pay for them cost and freight, for a carload of powder which they have ordered. It is understood that the papers conveying title to the stock of goods in store and the rights to the Leg mining machine shall not be placed in escrow, but be placed and executed at the time of delivery of the same. The parties heretofore agree to execute such further writings or agreements as may be necessary to carry out the objects of this agreement."

And a few days later a second written agreement in relation to the same subject-matter was executed by the same parties, which is as follows:

" THIS AGREEMENT, made and entered into this first day of August, A. D. 1890, by and between J. C. Osgood, of New York, in the State of New York, first party, and William H. Emerson and John Skinner, of Fulton county, Illinois, witnesseth:

That whereas the said second parties have this day sold, conveyed, transferred and delivered to Glenn W. Traer, as trustee for said first party, the property known as the Dunfermline Mine, situated on section twenty-three (23), township six (6) north, range (4) east of the 4th P. M., in Fulton county, Illinois, together with all the buildings, dwelling houses, machinery, tools, equipment, supplies and property of every kind and nature in and about and belonging to said mine, and also the leasehold right to mine and remove the coal underlying

Skinner v. Osgood.

said section twenty-three (23) above described, and have also conveyed to said first party sixty (60) acres of land, being a part of the east half ($\frac{1}{2}$) of the northeast quarter ($\frac{1}{4}$) of section twenty-two (22), township six (6) north, range four (4) east of the 4th P. M., in Fulton county, Illinois, together with all buildings and improvements thereon, and also the property known as the Liverpool Coal Railway, forming a connection between the Chicago, Burlington & Quincy Railroad on section fifteen (15), township six (6) north, range four (4) east of the 4th P. M., and the above described mine.

And whereas said first party has delivered to said second parties in payment for the property above conveyed, transferred and delivered to him, six hundred and fifty (650) shares of the par value of one hundred dollars ($100) each, of the fully paid, non-assessable stock of the White Breast Fuel Company, a corporation organized and existing under and by virtue of the laws of the State of Iowa, the receipt whereof is hereby acknowledged.

Now therefore, in consideration of the foregoing, said first party does hereby agree and obligate himself to purchase from said second parties the above described six hundred and fifty (650) shares of stock, and pay for the same at par on or before the first day of October, 1891; provided, however, that said second parties shall first notify said first party in writing at his office at number eighteen (18) Broadway, in the city of New York and the State of New York, on or before the first day of August, 1891, of their election to sell said stock to said first party hereunder.

It is agreed that time is of the essence of this contract, and that unless written notice as above set forth is served by said second parties or their agent, duly authorized, on said first party, then said first party shall be relieved from any and all obligations to purchase said stock from said second parties hereunder.

Witness the hands and seals of the parties hereto, this first day of August, A. D. 1890.

J. C. OSGOOD,    [SEAL]
WILLIAM H. EMERSON,  [SEAL]
JOHN SKINNER.    [SEAL] "

Later the following letter was sent by appellee to one of appellants:

" NEW YORK, August 27th, 1890.

MR. W. H. EMERSON, Astoria, Ill.:

DEAR SIR: I have your letter of the 13th inst. It is in accordance with my understanding that under the agree-

ment I have made with Mr. Skinner and yourself for the purchase of Whitebreast Fuel Company stock, I will buy the stock of either of you, should one wish to sell and the other not. You can attach this letter to the contract, which I think will be sufficiently binding on me. Have you been offering your stock for sale in New York? Mr. Tobey, a stock broker, has been hawking the stock around. The amount, 325 shares, leads me to believe it is either yours or Mr. Skinner's. I trust I am mistaken, for it seems to me it would have been courteous for you to let me know if you desired to sell the stock. As I told you, there is no active market for the stock, there having been none offered for sale, and under the present condition of the money market, there are few, if any, investors. It is possible Mr. Tobey was simply trying to see what he could get for the stock without intending to sell it, but in a close corporation like ours, not widely known, it does not do the stock any good to have it hawked around as he has done.

　　　　　　　　　　　　　Yours truly,
　　　　　　　　　　　　　J. C. Osgood."

On July 7, 1891, the American Trust and Savings Bank, acting under power of attorney for appellants, sent the following notice to appellee:

" DEAR SIR: Under a contract with Messrs. John Skinner and Wm. H. Emerson, dated Aug. 1, 1890, you have agreed to purchase from them 650 shares of the Whitebreast Fuel Co.'s stock, which was originally given them in partial payment for purchase of mines, and are in certificates, as follows:

　　　　　　　　No. 102, 100 shares.
　　　　　　　　No. 103, 100 shares.
　　　　　　　　No. 104, 100 shares.
　　　　　　　　No. 183,  25 shares.
　　　　　　　　No. 105, 100 shares.
　　　　　　　　No. 106, 100 shares.
　　　　　　　　No. 107, 100 shares.
　　　　　　　　No. 184,  25 shares.

The contract provides that in case they desire to avail themselves of the option to sell, they are to notify you on or before August 1, 1891, and accordingly, per authority vested in me by power of attorney, I hereby notify you that they desire you to purchase and pay for, August 1, as per contract, the 625 shares of stock. The same will be forwarded to you through our bank, the National Bank of the Republic.　　　　Signed by　　　G. B. SHAW,
　　　　　　　　　　　　　　　　　　　President."

The contract was carried out by appellee in all respects except that he refused to purchase and pay for the 325 shares of stock which constituted the portion of appellant Skinner.  This he refused to do upon the ground that the contract was illegal, being merely a contract for an option, and upon the further ground that Skinner had engaged in the coal business after the making of the contract in question.

For breach of the contract by appellee this suit was brought.

The only defense relied upon was that the contract was a contract for an option and illegal under the provisions of Sec. 130 of the Criminal Code, and that the notice sent by the attorney in fact of appellants to appellee was insufficient in that it specified 625 shares of the stock instead of 650 shares.

A jury was waived, and the issues were submitted to the court.  The court found the issues for the defendant, appellee.  The court held, upon propositions of law submitted, that the notice was sufficient, that appellee having refused to purchase upon the ground that the contract was illegal, the sufficiency of the notice was unimportant, and, in effect, that a recovery could not be had by appellants because the contract for the purchase of the stock was illegal under the provisions of Sec. 130 of the Criminal Code.

From judgment upon the finding of the issues for the appellee this appeal is prosecuted by appellants.

JOHN S. WINTER and CRATTY, JARVIS & CLEVELAND, attorneys for appellants.

Section 130 of the Criminal Code is in derogation of the common law and is highly penal, and hence must be strictly construed.  It should not be extended to cases not clearly within its terms.  Hall v. Irwin, 2 Gilm. 176, 184; Pickering v. Misner, 11 Ill. 597; Thompson v. Weller, 85 Ill. 197; Chicago v. Rumpff, 45 Ill. 90.

The defense is that the parties violated a criminal statute, that is, committed a criminal offense.  To sustain such

defense it is necessary to make out a case sufficient to convict the parties if on trial under indictment. Germania Fire Ins. Co. v. Klewer, 129 Ill. 599; Sprague v. Dodge, 48 Ill. 142; Harbison v. Shook, 41 Ill. 141; Crandall v. Dawson, 1 Gilm. 556; McConnell v. Del., etc., Ins. Co., 18 Ill. 228.

The contract should not be held void unless the parties could be indicted and convicted for making it, since it is the violation of the statute which makes the contract void.

The court should not be controlled in construing the contract by any particular phrase or language, but should consider the entire transaction and the two contracts in determining the real intent and agreement of the parties. Minnesota Lumber Co. v. Whitebreast Coal Co., 160 Ill. 85.

CHESTER M. DAWES and WM. McNETT, attorneys for appellee.

The contract for the right to sell the stock back to Osgood was in form a contract for an option to sell within the ordinary meaning of the term " option," and the definitions given in standard lexicons, and approved in the following cases: Tenney v. Foote, 4 Ill. App. 494, 95 Ill. 99; Schneider v. Turner, 30 Ill. 28; Webster's Dictionary, the word " option."

" Whoever contracts to have, or to give to himself or another the option to sell or buy at a future time any grain or other commodity, stock of any railroad or other company, or gold   *   *   *   shall be fined, etc.,   *   *   *   and all contracts made in violation of this section shall be considered gambling contracts, and shall be void." 1 Starr & Cur. Stat., p. 791.

MR. PRESIDING JUSTICE SEARS delivered the opinion of the court.

But two questions need be considered upon this appeal, viz: first, whether this contract comes within the prohibition of Sec. 130 of the Criminal Code, as a gambling contract, and second, whether the error in the notice of election to sell the stock according to the provisions of the contract will bar a recovery.

Skinner v. Osgood.

In the determination of the first question indicated, we regard the recent decision of the Supreme Court in Wolf v. Nat. Bank, 178 Ill. 85, as controlling.    In that case, which was merely a contract of purchase, with privilege of reselling at option of the purchaser, the court said:

" In other words, the bonds were turned over by the bank to the plaintiff at a certain stipulated price, with the distinct agreement that the plaintiff had the right, during the month of January, 1897, to elect whether he would keep them or return them to the bank, and in case he concluded to return the bonds, he was entitled to receive his money back with interest.    The transaction was one both reasonable and proper, and one not within or prohibited by the statute. Indeed, it contains no element of a gambling contract."

In the case here, as in the one cited, the privilege of reselling upon election was made a condition to the original transaction, and without such privilege it is to be concluded from the evidence that the stock would not have been accepted by appellants.    Indeed, the facts of this case are much stronger for the legality of the contract than were the facts in the case cited; for in this case the giving of the option to resell was an incident to an otherwise perfectly valid contract, including many important elements of transfer of other property, etc.    Under the authority of Wolf v. Nat. Bank, we hold that the part of this contract granting the privilege to resell is but an incident or condition to a valid contract, and that it is not within the prohibition of the statute.

The only other question to be considered is as to the sufficiency or necessity of the notice.

It seems apparent from an inspection of the notice, that it was intended to require a carrying out of the contract to repurchase all of the shares of stock in question, viz., 650 shares, and not merely 625 shares, the number mentioned in the latter part of the notice, and that the latter mention was a mistake.    The shares specified in the notice in detail amount to 650, and the expression " the 625 " can only be read intelligently as referring back to the shares specified, *i. e.*, 650.    It is contended by counsel that the court can not

disregard the mistake and read the notice as intended by the parties. If the mistake was latent, not apparent on the face of the instrument, and such that it would be necessary to resort to evidence *dehors* the writing to correct it, the contention would be sound; but when, from an examination of the writing itself, the intention of the parties can be clearly ascertained, a court of law will give effect to the intention, notwithstanding there may be some language used which, taken by itself, would not authorize the construction adopted. Mercantile Ins. Co. v. Jones, 87 Ill. 199; Holmes v. Parker, 25 Ill. App. 225; Bishop on Contracts, Sec. 383, 397, 420.

We are of opinion that the notice should be construed as an offer of the 650 shares of stock.

But aside from the terms of the notice, we do not regard the sufficiency of it as vital to a right to recover. Appellee, by refusing to carry out his contract upon the ground that it was illegal, and that Skinner had entered into competition with him in the coal business, waived any necessity of a notice under the provisions of the contract. After he had announced his refusal to comply with the contract, a demand would have been of no consequence. Lyman v. Gedney, 114 Ill. 388.

The many decisions in insurance suits as to waiver of notice would seem by analogy to apply here.

The trial court held upon propositions of law submitted, and we think rightly, both that the notice was sufficient and that the necessity of any notice was waived.

The judgment of the Circuit Court is reversed and the cause is remanded, with directions to the Circuit Court to enter a judgment in favor of appellants and against appellee for the amount shown by the evidence to be due to appellants upon the contract, viz., $32,500, with interest at the rate five per centum per annum from October 1, 1891. Reversed and remanded with directions.