## THE COUNTY OF COOK

*v.*

## THE CITY OF CHICAGO.

*Filed at Ottawa May 11, 1897.*

1. COUNTY OF COOK—*construction of the act of 1831, establishing the county of Cook.* Sections 10 and 11 of the act of 1831, establishing the county of Cook, which provided for the erection of public buildings upon lots provided and donated by the commissioners of the Illinois and Michigan Canal, authorize the sale of portions of the land to aid in the erection of public buildings upon the remaining portion. (*Lyman* v. *Gedney*, 114 Ill. 388, followed.)

2. SAME—*act of 1871 repealed the act of 1851, which prohibited the alienation of the "public square" in Chicago.* The act of October 20, 1871, (Laws of 1871, p. 170,) which appropriated a sum of money to the city of Chicago, a part of which was directed to be used by the city in erecting buildings on the site of former buildings which had been located on the "public square," repealed by implication, to that extent, the act of 1851, which prohibited the authorities of Cook county from selling or incumbering such public square.

3. EJECTMENT—*right of city of Chicago to use west half of the "public square."* The act of October 20, 1871, authorized the making of the contract subsequently entered into between the city of Chicago and the authorities of Cook county, by which the city was given the right to forever use the west half of the public square which had been dedicated to the public by the act of 1851, and no right of recovery in ejectment therefor exists on the part of the county against the city.

Writ of Error to the Circuit Court of Cook county; the Hon. Thomas G. Windes, Judge, presiding.

Robert S. Iles, (Frank L. Shepard, of counsel,) for plaintiff in error:

A dedication is an appropriation of land to a public use. The public, and not a public corporation, must be the chief beneficiary. *Todd* v. *Railway Co.* 19 Ohio, 514.

Where a statute is in its terms plain and unambiguous, there is no room for construction. *Brown* v. *Hogle,* 30 Ill. 119; *Martin* v. *Swift,* 120 id. 488; *Ottawa Gas Light Co.* v. *Downey,* 127 id. 201.

A dedication of land to public use must be understood and construed with reference to the objects and purposes for which it is made. *Godfrey* v. *Alton,* 12 Ill. 29.

An owner may, in the act of dedication, declare the specific use to which he intends the donation, and it will remain subject to such use; but when the dedication is completed the owner cannot thereafter revoke it, or restrict or change the uses to which the donation is put. *M. E. Church* v. *Hoboken,* 33 N. J. 18.

A dedication once made cannot be recalled, and the intention of the owner at the time of dedication is to be considered, and not his intention at a subsequent time. *Ruch* v. *Rock Island,* 5 Biss. 95.

The legislature cannot authorize a town to devote land dedicated to public uses to other purposes. *LeClercq* v. *Galliopolis,* 7 Ohio, 217.

A law authorizing land which has been dedicated by its owner for the purpose of a public square to be used for any other purpose, impairs the obligation of a contract, and is void. *Warren* v. *Lyons,* 22 Iowa, 351.

A municipal corporation will be restrained, at the instance of any citizen, from selling land dedicated by it as a public street, square or common. *Mayor* v. *Franklin,* 12 Ga. 239; *Rutherford* v. *Taylor,* 38 Mo. 315; *Court* v. *Newport,* 12 B. Mon. 538; *Commonwealth* v. *Rush,* 14 Pa. St. 186.

A county has no power not expressly conferred or necessary to the exercise of powers so conferred. *Hardin County* v. *McFarlin*, 82 Ill. 138.

A county has no power to dispose of its property or funds contrary to law. *Scales* v. *King*, 110 Ill. 456.

Agreement between parties must be one which the law permits to be made. *Penn* v. *Bornman*, 102 Ill. 525; Bush on Contracts, sec. 458.

No agreement to do an act forbidden by statute, or to omit to do an act enjoined by statute, is binding. *Penn* v. *Bornman*, 102 Ill. 523; 7 Wait's Actions and Defenses, 64, and authorities cited.

WILLIAM G. BEALE, Corporation Counsel, and GEORGE A. DUPUY, Assistant, for defendant in error:

In construing a statute the intent is to govern when it can be determined, and all parts of the statute must be given effect; and in determining the intent it is proper to consider the circumstances existing at the time of the passage of the statute, and the construction placed upon it then and subsequently. *Hamilton* v. *People*, 102 Ill. 567; *Comstock* v. *Clover*, 35 id. 470; Sutherland on Stat. Const. secs. 210, 307; *Perry County* v. *Jefferson County*, 94 Ill. 214; *Russell* v. *Rumsey*, 35 id. 262; *Isaacs* v. *Steele*, 3 Scam. 97; *People* v. *Commissioners*, id. 153; *Crews* v. *Aden*, 127 Ill. 231.

If two inconsistent acts be passed at different times the last is to be obeyed, and if obedience cannot be observed without derogating from the first, it is the first which must give way. *Dean of Ely* v. *Bliss*, 5 Beav. 582.

To justify a repeal by implication the repugnance between the statutes must be clear and plain, and if they are seemingly repugnant it is the duty of the courts so to construe them as to avoid such repeal by implication. *Hunt* v. *Railway Co.* 121 Ill. 642.

A subsequent statute revising the whole subject of a former one, and intended as a substitute for it, although it contains no express words to that effect, operates as

a repeal of the former. *Nichols* v. *Square*, 5 Pick. 168; *Bart-lett* v. *King*, 12 Mass. 537; *Towlę* v. *Mavett*, 3 Greenl. 22.

Counties have no right to procure all the benefits of an act which they are authorized to perform, and which is recognized and acted upon by them as legal, and then escape liability, any more than have private individuals. They must respond to their legal engagements the same as individuals. *Johnson* v. *Stark County*, 24 Ill. 75.

Mr. JUSTICE PHILLIPS delivered the opinion of the court:

The plaintiff in error brought its action of ejectment against the defendant in error to recover the west half of block 39, in the original town of Chicago. Block 39 was, with other lands, donated to the State of Illinois by the United States for the purpose of aiding in the construction of the Illinois and Michigan Canal, under and by virtue of an act of Congress approved March 2, 1827, entitled "An act to grant a quantity of land to the State of Illinois for the purpose of aiding in opening a canal to connect the waters of the Illinois river with those of Lake Michigan." The title to the whole of said block vested in the county of Cook in fee on or about November 10, 1831, by deed of donation from the commissioners of the Illinois and Michigan Canal and by grant from the State of Illinois by patent, in conformity with the act of the legislature of Illinois in force February 15, 1831. On the date at which the fee to said block 39 vested in the county of Cook, to-wit, November 10, 1831, and prior thereto, the municipality of the city of Chicago was not in existence, as the said city was not incorporated until the year 1837. In the act of the General Assembly of the State of Illinois in force January 15, 1831, creating the county of Cook, it was provided that the public buildings at Chicago should be erected on the public square, as laid off by the canal commissioners, on the south side of the Chicago river. The said original town of Chicago

was laid out and platted by the canal commissioners, and block 39 was part of the premises so platted by them, and within the memory of the oldest inhabitant was the only part of the said original town of Chicago known as the public square, and said block 39 was marked "reserved" on the plat. Subsequently to November 10, 1831, and up to and including February 4, 1851, the county of Cook did not alien, convey or encumber said block 39, nor any part thereof.

On the fourth day of February, 1851, the General Assembly of the State of Illinois, by an act entitled "An act to prevent the sale of the public square in the city of Chicago," dedicated block 39 to public use as a public common or square, and forbade the sale, mortgage, incumbrance or conveyance of the same, but permitted the location of county buildings thereon. The language of the act was as follows:

"Section 1. *Be it enacted by the People of the State of Illinois, represented in the General Assembly,* That block 39, in the original town of Chicago, be and the same is hereby dedicated to public uses as a public common or square.

"Sec. 2. The board of supervisors and all other county authorities of the county of Cook, and the common council of the city of Chicago, are hereby forbidden to sell, mortgage, incumber or convey the said block 39, or any part thereof.

"Sec. 3. Nothing in this act shall be construed to prevent the location of the county buildings on said block 39."

Prior thereto, and at the time of the passage of said act of February 4, 1851, the county of Cook was in sole and exclusive possession of the whole of block 39, and the occupancy of the west half by the city of Chicago commenced subsequently to the passage of said act of February 4, 1851. Sundry negotiations were had between the city and county authorities for the purchase, use or occupation of said block by the city prior to February 4,

1851, but none resulted in a contract or agreement or in any permanent occupancy of the said block, or any part thereof, by the city of Chicago.    The occupancy and use of the west half of block 39 by the city of Chicago for its corporate purposes began solely under and by virtue of an agreement entered into between the corporate authorities of the city of Chicago and the corporate authorities of the county of Cook, at a date subsequent to February 4, 1851, and such occupancy and use by the city of Chicago of said premises have since that time been continued solely by virtue of agreements between the corporate authorities of said city and said county, and the city now claims the right of possession by virtue of and through an alleged agreement entered into by it and the corporate authorities of said county of Cook on or about the 19th day of August, 1872, wherein it was specified that all former arrangements between said city and said county in reference to said block 39 shall be merged in such new agreement.  Whatever action in relation to any transfer of said premises to the city of Chicago, or the occupancy and use of said premises by the city of Chicago for its corporate purposes, has been taken by the corporate authorities of said city and county was solely upon their own motion and without reference to action by the people.    Under certain of these agreements the city used certain portions of this block as early as 1837, and in 1853 a building was erected, which was partly paid for by the county and partly by the city, and each used separate parts thereof.    In 1860 the building was enlarged under an agreement between the parties to this suit, and each used exclusively separate parts thereof.

All these acts between these parties, so far as shown by this evidence, were done without any definite agreement in writing other than a resolution of the board of supervisors of Cook county passed in 1868, which provided the city should be entitled to the west half of the then existing court house upon the payment of $50,000 by

the city to the county.   It was further provided the city should then have the privilege of erecting a building west of the court house.   The proposition embraced in this resolution was accepted by a resolution adopted by the common council of the city.   The city then erected a building on the west half of the said block, expending $400,000 for its construction, and entered into its exclusive use, with knowledge and consent of the board of commissioners of Cook county.   This condition of occupancy and exclusive use of separate parts of this block continued until the buildings were destroyed on October 9, 1871.   On October 12, 1871, a meeting of the city council was held, at which resolutions were adopted, as follows:

"*Resolved*, That this committee recommend that the common council, for the present, take possession of the court room of the Madison street police station for their meetings, and that the board of public works be required to immediately provide all the city officers and common council with temporary accommodations by erecting buildings on the old court house square.

"*Resolved*, That the board of public works be required to immediately prepare plans and specifications for a permanent building for all city officers and the common council, to be erected on the old court house square, and report the same as soon as possible to this council, and to at once proceed to clear off said square."

At that same meeting another resolution was passed, which was as follows:

"*Resolved*, That the board of public works be directed to confer with the board of supervisors, or a committee of said board of supervisors, in regard to erecting a public building on the court house square, jointly with the county, for all public officers."

Other than above, no action had been taken by the city council by which it had provided for sites upon which its public buildings of this character were to be erected, prior to October 20, 1871.

As a result of the calamity which befell the city, the General Assembly was specially convened early after the

9th of October, and enacted a law by which the lien of the city of Chicago on the Illinois and Michigan Canal and its revenues was discharged by refunding to the city the amount it had expended in the construction of the canal, with interest thereon, and for this purpose an appropriation was made to the amount of $2,955,340, to be paid from the State treasury. The proviso to section 1 of that act is: "That not less than one-fifth, nor to exceed one-third, of said sum so appropriated shall be received by said city, and be applied in reconstructing the bridges and public buildings and structures destroyed by fire, upon the original sites thereof, as already provided by the common council." An emergency clause was appended, because by a "great conflagration in the city of Chicago the buildings, bridges and other public improvements have been totally destroyed," etc. The act was approved and in force October 20, 1871.

Subsequently, on August 5, 1872, an agreement was made between the parties to this litigation, the substantial provisions of which were: "The said parties will join in the erection of a public building on said block 39 for the use of the county and city governments, respectively, and the courts of record of said county. The general exterior design of said buildings shall be of an uniform character and appearance, as may hereafter be agreed upon by the board of commissioners and the common council of the city of Chicago. The portion of said building situated west of the north and south center lines of said block shall be erected by the city of Chicago at its own expense. The city of Chicago shall occupy that portion of said block west of said center line for a city hall and offices incidental to the administration of the city government, and for no other purpose whatsoever, except as hereinafter provided. Each of the parties hereto will heat, light and otherwise maintain and furnish its own portion of said building. The necessary expenses of improving the grounds around said building, and maintain-

ing the same, shall be paid annually by the said city and county. The said agreement shall contain a covenant on the part of the county that said city of Chicago shall have the control of and occupancy of the said west half of said block for the said city hall and public offices incidental to the government of said city without hindrance, henceforth forever." Under this contract a building was erected and there was expended therefor the sum of $1,716,000, each party thereto paying its respective part, and each entering into possession and having exclusive control, the city of the west half and the county of the east half of said block.

This statement embodies the acts of the parties to this litigation and the legislation having reference thereto. On a trial in the circuit court of Cook county a finding and judgment were entered for the defendant, and this writ of error is sued out by the plaintiff.

The rights of the parties to this litigation rest on the construction to be given the act of 1831, the act of 1851, the act of 1871, and the acts of the parties hereto. By the act of Congress of March 2, 1827, the block in controversy, with other lands, was donated to the State of Illinois, subject to the disposal of the legislature, to aid in opening a canal to unite the waters of the Illinois river with those of Lake Michigan. By that act the State was authorized to sell and convey the lands so donated in fee. With the title to these lands so vested in the State, with power to sell and convey, the legislature enacted the act of January 15, 1831. This act provided, among other things, for the establishment of the county of Cook, with Chicago as the county seat. Sections 10 and 11 of that act are as follows:

"Sec. 10. The public buildings at Chicago shall be erected on the public square as laid off by the canal commissioners on the south side of the Chicago river, and on the public square laid off at Ottawa on the north side of the Illinois river.

"Sec. 11. If the canal commissioners shall make any donations of lots for the erection of public buildings at Ottawa or Chicago to the county commissioners of said counties, it shall be the duty of the county commissioners' courts of each of said counties to sell the same whenever they may think it best, and apply the proceeds thereof to the erection of a court house and jail at said county seats, respectively."

The block in question on the plat of the town of Chicago, as made by the canal commissioners, was marked "reserved." But this plat was not made until 1837. It is apparent from the evidence that a plat existed prior thereto, as, from the patent issued by the Governor on November 10, 1831, the title to lots 1, 2, 3, 4, 5, 6, 7 and 8, block 39, with other lands, was vested in the county commissioners of Cook county on November 10, 1831. The evidence shows that prior to 1837, when the canal commissioners' plat was made, this block was known as and called the public square. The patent issued by the Governor under the act of Congress of 1827, and the act of the legislature of this State of 1831, were for a specific purpose.

The act of 1831 was before this court and was construed in *Lyman* v. *Gedney,* 114 Ill. 388, where, with reference to the act of 1831, after quoting section 11 above, it was held in reference to a public square claimed to exist in Ottawa (p. 402): "Instead, then, of there being a donation of this block for a public square, the lots into which it is divided are donated to be sold to raise money with which to build a court house and jail. True, it is commanded that the public buildings shall be on the square as laid off, etc., and, we may admit, on this square; but it is not commanded the whole block shall be devoted to that purpose, and, construing the different sections together and giving practical effect to both provisions, the commissioners were required to use what they should deem necessary for the public buildings, and sell and

convey the residue in order to realize money to erect these buildings. If any trust was created it is by virtue of the section referred to authorizing the canal commissioners to make donation of the property, and the patent of the Governor pursuant thereto vesting title in the county commissioners. But this, as is thus seen, was only to aid in the erection of the buildings." Whilst this was held with reference to the city of Ottawa, yet it was under the act of 1831. In the same case it is further held: "That property which is conveyed to aid in the erection of public buildings is intended to be sold and converted into money would be self-evident."

In the *Lyman case* the patent was issued for the lots which constituted block 11 in the town of Ottawa, and that block was marked on the plat "Public Square," and it was held, under section 10 of the above statute, that the public buildings were to be placed on that lot. Yet that section did not require the whole lot should be used. In this case, that the public buildings in Chicago should be placed on this lot does not require that the whole lot should be so used. *Lyman* v. *Gedney* is conclusive on this question.

Without entering into the discussion of the power of the legislature under section 17 of article 13 of the constitution of 1848, which provides that "no * * * law impairing the obligation of contracts shall * * * be made," and without discussing whether the act of 1851 violates that provision, it is sufficient for our purpose here to waive those questions and concede that act in force. It may be conceded that its effect is to restrain the board of supervisors from encumbering, aliening or conveying block 39. The subsequent arrangements, by which, in 1868 and long prior thereto, the city was in possession and occupany of the west half of that block, and in the latter year expended $400,000 for the construction of its city hall, on the east half of which block the court house stood, both of which buildings were destroyed

in October, 1871, still necessitate a consideration of the effect of the act of October 20, 1871, on the act of February 4, 1851.

In 1871, and long prior thereto, the city was in possession of the west half of this block and of its city hall built thereon, which being destroyed, the city council, on October 12, 1871, adopted the resolution requiring the board of public works to prepare plans and specifications for a permanent building for all city officers and the common council to be erected on the old court house square, the half block in question. With this resolution as substantially the only act of the council in this behalf, the act of October 20, 1871, was passed, which made an appropriation of $2,955,340, to be paid from the State treasury to the city, and the proviso to which act required that not less than one-fifth nor to exceed one-third of that sum should be expended in reconstructing the bridges and public buildings and structures upon the original sites thereof, as already provided by the common council. The original site of the building occupied by the city council was the west half of this block, the site referred to by the resolution was the same, and the act of 1871 had reference to the same. The only construction to be given this act is, that it was required of the city that a certain part of this appropriation should be expended for the erection of buildings for its use on this block. This requirement was a recognition of the right to use the same. A recognition of that right was, in effect, a repeal of the act of 1851. If the act of 1851 prohibited the city from using this lot, the act of 1871 required it to do so. There is such repugnancy between the two acts that the latter is, by implication, a repeal of the former as to the west half of block 39, and after its passage the county had a right to convey to the city that part of that block.

August 28, 1872, the board of commissioners of Cook county and the city entered into a contract, by which it was agreed, among other things, that all former arrange-

ments between the city and county as to the use of said block 39 should be merged into a new agreement, by which the city and county agreed to join in the erection of a public building of uniform character on said block, for the use of the county and city governments and the courts of the county, the city to occupy the west half of the block for a city hall and offices incidental to the administration of the city government, and for no other purpose, except for use, under certain contingencies, by the Supreme Court of the State. The city was to pay the expense of a building for such purposes, to be erected on the west half of said block, the county agreeing to build on the east half a building for a court house. It was agreed that the city "should have the control and occupancy of the said west half of the block for the uses aforesaid without hindrance, henceforth and forever," with the further provision, however, that if the city should cease so to use the same the county should have the right to resume possession, and in such case the city should forfeit all its rights therein and the contract should be void. For the rights given under this agreement the city released a debt due to it from the county of about $30,000, and conveyed to the county what were known as the "hospital lot" and the "criminal court block," both being very valuable pieces of real estate in the city. Soon after this contract was made the city and county authorities proceeded to erect the building or buildings now on this block, and under the provisions of this contract the west half of the building was constructed by the city at a cost of $1,716,000. The effect of the act of 1871 was to authorize that contract. By it the right to use the west half of this lot by the city forever was given. No right of recovery exists on the part of the county against the city.

The judgment of the circuit court is affirmed.

*Judgment affirmed.*