THE PEOPLE, suing by the Canal Commissioners, Appellant, vs. THE CHICAGO AND NORTHWESTERN RAILWAY COMPANY, Appellee.

*Opinion filed February 19, 1909—Rehearing denied April 9, 1909.*

1. EVIDENCE—*what cannot be proved to impeach deed by canal trustees.* The act of 1836, prohibiting sales of canal lands to the canal commissioners, directly or indirectly, even though it might be regarded as applying to canal trustees appointed under the act of 1843, does not include within its terms the attorney and the land agent of such trustees, and in ejectment, where the legal title must prevail, proof that the grantees in a deed by the canal trustees were the attorney and the land agent of such board is not admissible to impeach the deed, there being no offer to prove that the trustees themselves were interested in the sales.

2. PLATS—*canal commissioners' plat evidences their act in laying out the town of Chicago.* The plat adopted by the commissioners of the Illinois and Michigan canal, and which, as certified and recorded in 1837, bears the words, "A map of the town of Chicago, by James Thompson, August 4, 1830," must now be regarded as evidencing the act of the commissioners in laying out the town, and the question whether a tract shown on such plat was dedicated by the commissioners as a street must be determined by what was then done.

3. SAME—*when statement as to width of streets is not conclusive.* The statement in the canal commissioners' plat of the town of Chicago that the streets are all eighty feet in width is not conclusive that an undesignated tract bordering on the Chicago river and having a greater width than eighty feet was not intended as a street, since it appears from an examination of the plat that the designated streets bordering on such river and its branches are of irregular width, in some places less and in others much greater than eighty feet.

4. SAME—*strip need not be designated as a street to show an intention to dedicate.* In order to show an intention to dedicate a strip for the use of the public as a street it is not essential that the strip be designated as a street, if, upon a consideration of the entire plat, there is something on the face thereof indicating such intention. (*Birge* v. *City of Centralia,* 218 Ill. 503, and *Poole* v. *City of Lake Forest,* 238 id. 305, distinguished.)

5. SAME—*canal commissioners' plat of town of Chicago construed.* From an inspection of the entire plat of the town of Chicago made by the canal commissioners in 1830 and certified and

recorded in 1837, the undesignated strip of land lying between block 7 and the north branch of the Chicago river and running south, thence east and north-east around block 14 to the northeast corner of block 15, was intended by the commissioners as a street and was a part of North Water street.

6. DEEDS—*act of 1853 did not require deed from city of Chicago to vacated streets to be approved by court.* Under the act of 1853 the city of Chicago, upon vacating any street immediately fronting upon the Chicago river or its branches, was authorized to convey the interest which the State would otherwise have in the vacated streets, and no order or decree of any court was necessary to the passage of title, so far as the State was concerned.

7. SAME—*purpose of act of 1851, authorizing city to convey its interest in vacated street.* The purpose of the act of 1851, (Laws of 1851, p. 112,) authorizing a city to convey any interest it "may have had" in a vacated street, was to give that right where the State itself had been the dedicator or where the city had been platted, pursuant to the statute, by a private individual; and even if, for constitutional reasons, the legislature failed so far as the latter instance is concerned, the purpose was not defeated in cases where the State itself was the owner of the possibility of reversion.

8. SAME—*city of Chicago had power to convey fee of vacated streets dedicated by canal commissioners.* The city of Chicago, under the act of 1851, had power to convey the fee to abutting owners in cases where streets dedicated by the canal commissioners in their plat of the town of Chicago were vacated by the city under the authority of such act.

9. CANALS—*policy of State in donating canal lands was not in violation of the trust.* The policy of the State in encouraging the growth of towns and cities on canal lands by donating canal lands for certain public purposes and vesting the fee of the streets in the town or city is justified on the theory that the commissioners could obtain a greater aggregate price for the lots and blocks retained than they could for all the lots and blocks, including the land dedicated, had no dedication been made, and such policy was not in violation of the trust imposed by the act of Congress authorizing the disposal of canal lands for the sole purpose of aiding in opening the canal.

APPEAL from the Circuit Court of Cook county; the Hon. JULIAN W. MACK, Judge, presiding.

On March 23, 1905, the People of the State of Illinois, suing by the canal commissioners, brought an action of ejectment in the circuit court of Cook county against the

Chicago and Northwestern Railway Company, appellee, to recover possession of lots 1, 2, 3 and 7 and the west twenty feet of lot 4, all in block 7 of the original town of Chicago, and also all that part of the said original town of Chicago which lies south of the south line of Kinzie street, north of the center line of Carroll street, as originally laid out, east of the north branch of the Chicago river and west of the west line of said block 7.

To the declaration as amended the railway company interposed the general issue. Upon a hearing before the court without a jury, judgment was entered in favor of the defendant. To review that judgment the plaintiff has prosecuted this appeal.

The land in controversy was originally part of the lands granted to the State of Illinois by the United States government on March 2, 1827, for the purpose of aiding the State in opening a canal connecting the waters of Lake Michigan with those of the Illinois river, (4 U. S. Stat. at Large, p. 234,) and was a part of that realty which was platted by the canal commissioners as the "Town of Chicago." For more than fifteen years it has been in the possession of the appellee, who claims under certain deeds purporting to convey the property to it. For more than fifteen years it has been used as a part of appellee's station grounds at its principal station in the city of Chicago.

Appellee claims title to a part of the land through a deed to Isaac N. Arnold and Eli S. Prescott, to whom, appellee contends, that part was conveyed by the canal trustees; and to the remainder through deeds from the city of Chicago, executed, according to appellee, pursuant to authority given by certain acts of the legislature. It is contended by appellant that these deeds were not effective and that the title to the realty remains in the State. All of these deeds were executed more than forty years before the beginning of this suit, the persons holding pursuant thereto have always been in the undisputed possession of the

realty, have paid taxes thereon and have exercised the ordinary acts of ownership.

The following is a portion of the plat pursuant to which realty in the original town of Chicago was sold by the canal authorities and shows the property involved in this suit:

Different questions arise in reference to different parts of the lands involved. For the purpose of the consideration of these questions the property is arbitrarily divided into three parts:

Parcel "A" is lots 1, 2, 3, 7, and the west twenty feet of lot 4, in block 7, in the original town.

Parcel "B" is that tract lying south of Kinzie street, north of Carroll street as originally platted, east of the north branch of the Chicago river and west of the west line of said block 7.

Parcel "C" is that part of the north half of Carroll street, as originally platted, which lies east of the north branch and west of the west line of said block 7 extended to the south.

Several errors have been assigned.

WILLIAM RITCHIE, and SAMUEL B. KING, for appellant:

Sections 39 and 40 of the Canal act of January 9, 1836, and section 20 of the Canal act of February 26, 1839, were binding upon the canal trustees, and their effect was to render void the deed for lots 1, 2, 3, 4 and 7, block 7, from the canal trustees to Prescott and Arnold. Laws of 1835-36, p. 145; Laws of 1839, p. 177; *Granger* v. *Canal Trustees,* 18 Ill. 444; *Canal Trustees* v. *Brainard,* 12 id. 500; *Whipple* v. *Whipple,* 109 id. 418; *Harris* v. *Runnels,* 12 How. 79; *Penn* v. *Bornman,* 102 Ill. 523; *Levison* v. *Boas,* 12 L. R. A. (N. S.) 577, note; *Lead Co.* v. *Elevator Co.* 208 Ill. 199.

Under the terms of the act of Congress of March 2, 1827, granting land to the State for a canal, the State could not lawfully donate this land to the city of Chicago, or to third persons, in the manner disclosed by the evidence herein. If the laws of the State are construed as having such intent, they are void as in conflict with said act of Congress. *Canal Trustees* v. *Brainard,* 12 Ill. 489; *Railroad Co.* v. *United States,* 92 U. S. 739; *United States* v. *Michigan,* 190 id. 401; *Swan* v. *Lindsey,* 70 Ala. 507; *Tucker* v. *Ferguson,* 22 Wall. 571; *VanBrockelen* v. *Tennessee,* 117 U. S. 168; *Carr* v. *Railroad Co.* 74 Ga. 73; *First Univ. Society* v. *Boland,* 155 Mass. 171; *Second Univ. Society* v. *Dugan,* 65 Md. 460; *Gebhardt* v. *Reeves,* 75 Ill. 306; *Hopkins* v. *Grimshaw,* 165 U. S. 342; *People* v. *Canal Trustees,* 14 Ill. 296; *Trustees of Schools* v. *Braner,* 71 id. 546; *Mott* v. *Danville Seminary,* 129 id. 403; *Canal Trustees* v. *Daft,* 48 id. 96.

The Wharfing Privilege acts of February 27, 1847, and February 11, 1853, properly construed, express no intention to donate the State's interest in this land, without compensation to the canal fund, to the city of Chicago or to third persons. Endlich on Interp. of Statutes, sec. 428; Maxwell on Statutes, chap. 12, sec. 2; *Railroad Co.* v.

*Joliet*, 79 Ill. 44; *Yates* v. *Milwaukee*, 10 Wall. 505; *Grand Rapids* v. *Powers*, 89 Mich. 94; *Chicago* v. *Laflin*, 49 Ill. 177; *Queen* v. *London Council*, L. R. 1 Q. B. 195; *Slidell* v. *Grandjean*, 111 U. S. 438; *Coosaw Manf. Co.* v. *South Carolina*, 144 id. 562; *Mills* v. *St. Clair County*, 2 Gilm. 197; *Hackett* v. *Railway Co.* 235 Ill. 123; *United States* v. *Whitridge*, 197 U. S. 135; *Wilcoxon* v. *McGhee*, 12 Ill. 386; *Stanley* v. *Schwalby*, 147 U. S. 514; *Chicago* v. *Rumsey*, 87 Ill. 352; *Davenport* v. *Johnson*, 186 id. 480.

The Statute of Limitations is no defense against the State. *Whittemore* v. *People*, 227 Ill. 474; *Piatt County* v. *Goodell*, 97 id. 84; *Cook* v. *Foster*, 2 Gilm. 652; *Bank* v. *Brown*, 1 Scam. 106.

The defense of *laches* or estoppel *in pais* is not available against the State. The assessment or taxation of this property by taxing officials as if private property does not estop the State. *People* v. *Brown*, 67 Ill. 436; *Bouton* v. *Supervisors*, 84 id. 395; *Tyler* v. *Bailey*, 71 id. 37; *Catlett* v. *People*, 151 id. 23; *Dement* v. *Rokker*, 126 id. 174; *Hamilton* v. *Railroad Co.* 124 id. 235; *Chicago* v. *Borden*, 190 id. 430; *Lake View* v. *LeBahn*, 120 id. 92; *Chicago* v. *Wright*, 69 id. 318.

S. A. LYNDE, and BARTON CORNEAU, (LLOYD W. BOWERS, of counsel,) for appellee:

Section 39 of the Canal act of January 29, 1836, was not binding upon the canal trustees appointed under the Canal Trust act of February 21, 1843. Laws of 1842-43, p. 56.

Even if section 39 of the Canal act of 1836 was applicable to the canal trustees, it did not render void the sale by the trustees to their employees, Prescott and Arnold. Laws of 1838-39, sec. 20, p. 177.

Even if the conveyance to Prescott and Arnold of "Parcel A" was voidable because of their fiduciary relations to the canal trustees, it cannot be attacked in this action, where

only legal titles can be tried, nor could it now be success-
fully attacked in equity.    *People* v. *Force,* 100 Ill. 549;
Pomeroy's Eq. Jur. sec. 1048.

"Parcel B" was part of a street dedicated by the canal
commissioners' plat of the original town of Chicago.  El-
liott on Roads and Streets, (2d ed.) sec. 18; *Smith* v. *Flora,*
64 Ill. 93; *Gridley* v. *Hopkins,* 84 id. 528; *Coal Co.* v.
*Challis,* 200 id. 222; *Thompson* v. *Maloney,* 199 id. 276;
*Ingraham* v. *Brown,* 231 id. 256; *Chicago* v. *Rumsey,* 87
id. 348; *Zinc Co.* v. *LaSalle,* 117 id. 411.

The Wharfing Privilege acts of 1847 and 1853 author-
ized the city to vacate and convey "Parcel B," and, as
against the State, no proceedings for the confirmation of
the city's conveyance were necessary.    *Canal Trustees* v.
*Havens,* 11 Ill. 554; *Allen* v. *Munn,* 55 id. 486; *Schuyler
County* v. *Mercer County,* 4 Gilm. 20; *Meadowcroft* v.
*Winnebago County,* 181 Ill. 504; *Blair* v. *Worley,* 1 Scam.
177; *People* v. *Knopf,* 171 id. 191; *People* v. *Morgan,* 90
id. 558; *Dunham* v. *Schuyler,* 4 Gilm. 221; *People* v.
*Loewenthal,* 93 Ill. 191; *Linck* v. *Litchfield,* 141 id. 469;
*People* v. *Kipley,* 171 id. 44; *Bunn* v. *People,* 45 id. 397;
*People* v. *Casualty Co.* 153 id. 25; *Mathews* v. *Shores,* 24
id. 28; *Railway Co.* v. *Supervisors,* 44 id. 240; *Headen* v.
*Rust,* 39 id. 186; *Comstock* v. *Cover,* 35 id. 470; *Knox
County* v. *Adams,* 22 id. 175; *Isaacs* v. *Steel,* 3 Scam. 97.

The State was not prohibited by the act of Congress of
March 2, 1827, from authorizing the city to convey these
vacated streets to private individuals without compensation
to the State.    *Chicago* v. *Rumsey,* 87 Ill. 348; *Lyman* v.
*Gedney,* 114 id. 388.

The city was authorized by law to convey this land to
the abutting owners upon vacation of the street.    Laws of
1851, p. 112; *Gebhardt* v. *Reeves,* 75 Ill. 301; *Chicago* v.
*Rumsey,* 87 id. 348; *Zinc Co.* v. *LaSalle,* 117 id. 411;
*In re Rahrer,* 140 U. S. 545; *Commonwealth* v. *Calhane,*
27 N. E. Rep. 881; *State* v. *Lard,* 29 Atl. Rep. 566.

The State cannot be heard to allege any objection to a deed made in pursuance of the statute of 1851.  *Commonwealth* v. *Andre,* 3 Pick. 224.

Equity and sound public policy require this court to sustain the contemporaneous practical constructions of the various acts involved in this case under which the property rights of appellee and numerous others have accrued, and the contention of appellant that every doubt should be resolved in its favor is without merit.  *Lyman* v. *Gedney,* 114 Ill. 388; *Rockefeller* v. *Arlington,* 95 id. 375; *People* v. *Wieboldt,* 233 id. 572; *People.* v. *Rock Island,* 215 id. 488; *Bryan* v. *Buckmaster,* Breese, 408; *People* v. *Marshall,* 1 Gilm. 672; *Harrison* v. *People,* 191 Ill. 257, and 195 id. 466; *Iuka* v. *Schlosser,* 97 Ill. App. 222.

Mr. JUSTICE SCOTT delivered the opinion of the court:

In 1858 the canal trustees for a valuable consideration, said to have been $10,800, executed to Arnold and Prescott a deed for parcel "A." The price was fixed by an appraisement pursuant to a statute then in force. Appellee claims under this deed through various *mesne* conveyances. On the trial appellant, for the purpose of showing the deed to Arnold and Prescott to be void, offered evidence to show that at the time they bought this parcel from the canal trustees, Arnold, who was an attorney at law, was the general counsel and legal adviser of the canal trustees and was paid an annual salary by them for his services; that Prescott was at the same time the land agent of the canal trustees, received a yearly salary for his services, and had general charge of the canal lands and lots that were from time to time offered for sale by the canal trustees. To that evidence so offered an objection was sustained, and it is urged that the proof was admissible.

In 1836 the legislature passed an act providing for the construction of the Illinois and Michigan canal, (Laws of 1835-36, p. 145,) which repealed an earlier act providing
239—4

for the construction of the same canal. The act of 1836
provided for the appointment of a board of canal commis-
sioners, and provided that none of that board should be al-
lowed to purchase any of the canal lands or lots, and that
neither of them should be directly or indirectly concerned
in any such purchase or have any manner of interest there-
in, and that all sales in which any commissioner should be
in anywise interested should be null and void; that the pur-
chase money should be forfeited and that the land should
revert to the canal fund. The act of February 21, 1843,
(Laws of 1843, p. 54,) was an act providing for the com-
pletion of the canal and for the payment of the canal debt.
That act provided for the selection of a board of trustees
and vested in them the title of the State to the canal prop-
erty, including the lands and lots unsold. Appellant sought.
to show that it was by such trustees that Arnold and Pres-
cott were appointed or employed. It is contended that the
prohibition above referred to contained in the act of 1836
applied to the trustees and to their attorney and land agent,
and that for this reason the deed to Arnold and Prescott
was null and void and the title to parcel "A" remained in
the State. If it be conceded that the prohibition of the act
of 1836 applied to the trustees who were to be appointed
under the provision of the act of 1843, it is yet apparent
from an inspection of the earlier enactment that the deed
to Arnold and Prescott was not within its terms. The sales
which were to be null and void were sales to the commis-
sioners or to any one of them, or sales in which they or
any one of them should be concerned, or in which they or
any one of them should have any manner of interest. Ap-
pellant did not offer to show that either of the trustees was
concerned or had any manner of interest in the sale to Pres-
cott and Arnold. For that reason the proof offered would
not have brought the sale to Prescott and Arnold within
the statute relied upon. Whether the relation of Prescott
and Arnold to the board of trustees was such that the deed

was voidable and could have been set aside in equity is immaterial. Here the legal title must prevail. The deed is effective in this suit as it was not made null and void by the statute. (*People* v. *Force,* 100 Ill. 549.) The offered evidence was properly excluded.

As to parcel "B," the first question is whether, when the canal commissioners platted the town, it was by the plat dedicated to the public as a street. The appellee's title rests upon the theory that it was so dedicated. It will be observed that the first street south of that tract running east and west was Carroll street; that the word "Carroll," as indicating the name of that street, appears in the strip left for the street on the west side of the north branch, and that the abbreviation "St.," which accompanies the word "Carroll," appears in the space left for the street on the east side of the north branch and between blocks 7 and 14. Continuing east there was a swale or depression which came from the north, passed across the central portion of block 6 (the block next east of block 7) and led into the main body of the Chicago river. A short distance east of that depression, on the plat appear the words "North Water," and farther east again the abbreviation "St.," which show that the strip of land immediately north of the main river was North Water street. The contention of appellant is that Carroll street and North Water street abutted upon each other at the swale in question and each ended there. Appellee agrees that Carroll street ended at the line mentioned, but contends that North Water street, when it reached that depression, turned to the south-west, and continued south and west, between the river and blocks 15 and 14, to the south-west corner of block 14, where it turned and ran north to Kinzie street and included parcel "B." Kinzie was the north boundary of the ground platted.

It is said by appellant that the commissioners intended to reserve parcel "B" from sale to be used as a part of the bed of the canal, for the reason that by an act passed in

1837 (Laws Extra Sess. 1837, p. 10,) the canal commissioners were authorized to enlarge the natural basin at the confluence of the north and south branches of the Chicago river and this would make it necessary for the commissioners to use this tract. Section 13 of the act of March 2, 1837, (Laws of 1837, p. 39,) being an act amendatory of the act for the construction of the canal, provided that the canal commissioners should cause the plat of the town of Chicago, by which they were governed in selling lots therein, to be recorded, with the certificates of the "late canal commissioners" endorsed thereon as to the identity of said plat, and it is pursuant to that enactment that the plat now before us was certified and recorded. Whether or not the tract in question was dedicated by the commissioners as a street must be determined by what was done when the plat of the town was made or adopted by them. The plat, so certified and recorded in 1837, bears thereon, among other things, these words: "A map of the town of Chicago, by James Thompson, August 4, 1830." While this record does not show that Thompson made this map for or by direction of the commissioners, it does appear from the certificate of the commissioners endorsed on the map that if it was not made under their direction it was at least adopted by them as early as June, 1836, and it must now be regarded as evidencing their act in laying out the town. The purpose of creating a basin is first indicated by the act of 1837. There is nothing to show that the commissioners in 1836, or prior thereto, entertained any such scheme, or if they did, that the land on the east side of the north branch, including parcel "B," would have been any more necessary thereto than would have been a part of the strip of land along the west side of the south branch and along the west side of the north branch, all of which was clearly included in West Water street. In this connection it is also to be observed that according to this plat the strip of land on the east side of the south branch, and continuing along the south side of

the main river, was dedicated as a street and named South
Water, and that the strip on the north side of the main
river was dedicated in like manner and named North Water,
so that if the appellant's contention be correct, parcel "B"
and the land south, continuing around blocks 14 and 15 to
the swale, is the only land bordering the river that was not
dedicated for street purposes. There is a statement upon
the plat to the effect that the streets are all eighty feet in
width, while the tract in question was one hundred and fifty
feet in width at one end and one hundred and sixty feet in
width at the other. It requires but a casual examination
of the plat, however, to see that the statement in reference
to the width could have had no application to the water
streets. They are all of irregular widths, and by compari-
son with other streets it is apparent that in some places the
width of each water street is greater than eighty feet and
in other places less than eighty feet. It is also pointed out
that upon the plat a line extends across the north end of
parcel "B" from the line indicating the east bank of the
north branch to the north-west corner of block 7 while there
is no such line across the end of the other streets, and this
is regarded by appellant as a circumstance indicating that
this strip was not intended to be left open to public travel.
There are certain other circumstances, however, which seem
to us to have greater weight. If North Water street, com-
ing from the east, terminates at the swale in question there
is no street on the south or east of block 15 nor on the south
of block 14. Coming east from the south-west corner of
block 14, after passing lots 5 and 6, the south line of the
block turns to the north-east, and that line continues in that
direction until it strikes Market street, and beyond that a
line forming the boundary of block 15 continues in the same
direction to the north-east corner of that block. No pur-
pose of fixing the boundaries of blocks 14 and 15 by that
line so diagonally drawn can be suggested except the pur-
pose of leaving a street next the river. Again, if there was

no street on the south and the west of block 14, lots 5, 6 and 7 in that block would not touch upon any street. If that be the condition, they were the only lots in the entire plat that were cut off from a public street. Counsel for appellant insist that it is ridiculous to regard this strip as a street because they say the line of travel thereon would be longer than upon any of the other routes actually dedicated as streets, and that if an intention could be imputed to the canal commissioners to dedicate this tract as a street it could only be regarded as an invitation by the canal commissioners to the public to inconvenience itself by using this circuitous route in preference to the many shorter routes established as streets on the plat. This depends very largely upon the point from which and the point to which the traveler desired to proceed. If he was on Kinzie street at any place between the north-west corner of block 7 and the river bank and desired to reach the south line of lot 6 in block 14 he would find this strip affording the most direct route, and the right to cross it would give to the owners of the lots on the west side of block 7 and the west and south sides of block 14 the most direct access to the river that they could possibly have.

In *Ingraham* v. *Brown,* 231 Ill. 256, we said: "In order to show an intention to dedicate said strip to the use of the public as a street it was not necessary that the strip be named as a street, as such intention may be established in any conceivable way by which it may be made manifest that it was intended to set said strip aside as a public street." Applying the law so stated, it seems clear to us from an inspection of the entire plat that the strip in question lying between block 7 and the north branch, and running south and thence east and north-east around block 14 to the depression at the north-east corner of block 15, was intended by the commissioners for a street and was a part of North Water street.

So far as the precise question now before us is concerned, the case of *Thompson* v. *Maloney,* 199 Ill. 276, is, we think, in point. There, on three sides of the platted lots and blocks, there appeared on the plat a strip thirty-three feet in width, without anything in words on the strip to show the purpose in so outlining that strip. The court reached the conclusion that it appeared from the plat that it was the purpose to dedicate this strip as one-half of a street, the other half whereof the proprietor expected and intended should be furnished out of the adjoining premises when they should thereafter be platted. There, as here, a consideration of the entire plat led unerringly to the conclusion that the ground in controversy was dedicated for street purposes.

We think this case is distinguishable from the case of *Birge* v. *City of Centralia,* 218 Ill. 503, upon which appellant places reliance. In this case, as in that, no words appear on the particular piece of ground as it is shown on the plat, indicating that it was intended as a street. Still here there is, as we have attempted to indicate above, something upon the face of the plat to show that this strip was intended for a street, while in the *Birge case* there was nothing on the plat to indicate that the land there in question was so intended. What has just been said in reference to the case last cited is applicable also to the case of *Poole* v. *City of Lake Forest,* 238 Ill. 305.

In certain later legislation, as well as by certain conveyances, it appears that parcel "B," and the tract immediately south thereof and west of block 14 and the strip of land immediately east of the south branch of the river, have been frequently designated as East Water street. The name that was given to the street of which this parcel formed a part, or whether it was given any name at all, is entirely immaterial, the only question being whether it was dedicated to the public as a street.

This court has held that the effect of this plat so made by the canal commissioners was to vest the fee of the streets in the local municipality for the use and benefit of the public, precisely as would have been done by a statutory plat made in 1837. It left in the State a reverter or a possibility of reversion, which would become a fee in the State if the streets should thereafter be vacated by the local municipality. *Canal Trustees* v. *Haven*, 11 Ill. 554; *City of Chicago* v. *Rumsey*, 87 id. 348; *Matthiessen & Hegeler Zinc Co.* v. *City of LaSalle*, 117 id. 411; *St. John* v. *Quitzow*, 72 id. 334; *Gebhardt* v. *Reeves*, 75 id. 301.

The town of Chicago was organized in 1833 under the provisions of an incorporating act which was passed by the legislature in 1831. (Laws of 1830-31, p. 82.) In 1835 an act to change the corporate powers of the town of Chicago was passed. (Laws of 1835, p. 204.) Section 6 of that act empowered the trustees of the town to lease the wharfing privileges of the town, giving to the owners or occupants of the lots fronting the river the preference of such privileges. In November, 1835, the town trustees made and recorded a "map of water lots," by which small lots were designated in the wider parts of the various water streets. These small lots in some instances extended into the water, and the plat was made for the purpose of more conveniently leasing the wharfing privileges. Upon that map it is shown that four lots, being lots 1, 2, 3 and 4 of block 1, were laid out in that portion of parcel "B" immediately west of the east eighty feet of that parcel, the effect of which was to leave an open street eighty feet in width between the east line of these water lots and the west line of block 7. Express authority for the making and recording of this plat seems to have been lacking. In the same month the town trustees proceeded to sell leases of the wharfing privileges for terms of 999 years, and practically all such privileges seem to have been so leased during that month. In January, 1836, an act was passed by the legis-

lature (Laws of 1835-36, p. 180,) amending the act of 1835 last referred to, and by the amendatory act it was provided that the trustees should not have power to make a lease of any wharfing privilege for any one term longer than five years.    On February 27, 1833, an act providing for making and recording town plats was passed, (Rev. Stat. 1833, p. 599,) and it was evidently with a view to preserving evidence of a compliance with the spirit of that act that the canal commissioners were by the act of 1837, hereinabove mentioned, required to certify and record the plat by which they sold lots in the original town of Chicago.

The act pursuant to which the city of Chicago was organized was passed on March 4, 1837. (1 Laws of 1837, p. 50.)    It authorized the city council to make wharfs and slips at the end of streets on property belonging to the city, but expressly provided that no power was given to alter, change, lay out in lots or lease any of the ground lying in North and South Water streets or between the river and those streets.    In 1847 the city's charter was amended (Pr. Laws of 1847, p. 82,) but the prohibition just mentioned was continued.    In the same year an act to adjust and settle the title to the wharfing privileges in the city of Chicago was passed.    The preamble of that act, which is the act of February 27, 1847, (Pr. Laws of 1847, p. 214,) recited the following:

"Whereas, those portions of land or parts of South Water, North Water, West Water and East Water streets, in the original town of Chicago, (on the sides of said streets nearest the river,) which lie eighty feet distant from the lines of the lots laid out on the sides of said streets farthest from the river, sometimes known as the 'wharfing privileges,' are now, and have been for a long time past, made subject of much controversy between different persons and corporations claiming the title to the same; and whereas, as they are now situated, neither the city of Chicago nor any person or body corporate derives any benefit from

the same except the persons who are occupying them, but they are a fruitful source of discord, dissatisfaction and illegal violence; and whereas, it is for the benefit of all parties claiming an interest therein that the questions arising as to the title to the same shall be settled and determined as speedily as possible," etc.

The act authorized the city to make any voluntary agreement it might deem expedient with the claimants of the wharfing privileges in these streets, but provided that no such settlement effected by mere contract and not by judicial procedure should affect the interests of the State or the canal trustees. It also provided for the adjustment of conflicting rights by a proceeding in court to which the State could be made a party. It also authorized the city to alter, widen and discontinue all four of the water streets, provided that the rights of the State and the canal trustees, "if any," should not thereby be prejudiced. In 1851 the city of Chicago was given a new charter, by which the common council was authorized to lease the wharfing privileges, no lease to be for a longer period than three years and the owners of adjoining lots to have the preference in leasing the property. Rights respecting the wharfing privileges theretofore acquired were protected by the act. Power was also given to open, widen and vacate streets and alleys. In 1853 the legislature passed an act (Laws of 1853, p. 529,) to amend the act of February 27, 1847, providing for the adjustment and settlement of titles to the wharfing privileges in Chicago. By this act of 1853 it was provided that the common council should have the power to discontinue and vacate the whole or any part of North Water, East Water and West Water streets, or so much of any other street in said city as immediately fronted upon the Chicago river or any of its branches, and to compromise or adjudicate any and all conflicting claims arising between the city and any or all persons or corporations who were or might be claimants of the fee or any portion of these

streets or any right or interest therein, and it was further
provided that upon such compromise or adjustment the said
city might convey, by deed, the fee in the vacated or dis-
continued portion of the streets to such persons as the coun-
cil might deem entitled to the same under the provisions of
the act or the act which it amends, and that all deeds which
might be made by the city under the provisions of the
original act or the amendatory act should be valid and ef-
fectual for the conveyance of the fee.   This act also pro-
vided that before such deeds or conveyances executed by
the city should bar the rights of other persons claiming an
estate in the portions of the street vacated or discontinued
the conveyance should be approved by a court under the
provisions of the amendatory or the original act, or an
order of the circuit court should be made upon a petition
filed by the city or any person or party claiming title un-
der such deeds, respectively, approving or confirming such
deeds or conveyances upon notice to be given.   By section 5
of this act of 1853 it was provided that it should not be
necessary to make any person or corporation a party to any
bill authorized to be filed by the original act, except such
persons or corporations as shall have an interest in the fee
or private use of the property, the title to which was to be
settled pursuant to the prayer of the bill to be filed.   The
amendatory act made no reservation of interest of the State
or canal fund in the property to be conveyed, and in *Allen*
v. *Munn,* 55 Ill. 486, this court said in reference thereto:
"On the eleventh of February, 1853, the legislature passed
another act of the same general purport but giving the city
the power to make conveyances of the wharfing privileges
to such persons as it might think entitled to the same, with-
out any reservation of rights to the State or the canal trus-
tees."

The city having been authorized to convey by deed any
rights which might otherwise have existed in the State or
in the canal trustees, the question arises whether, under the

act of 1853, it was necessary to have the deed of the city approved by the court under the provisions of the original or the amendatory act. The provision of section 1 of the act of 1853 is, "that before any such deeds or conveyances shall bar or preclude the rights of any other person or persons claiming an estate in such portion of said streets thus vacated or discontinued," such deed shall be approved by the court, etc. The persons as to whom such approval was necessary were persons claiming an estate in portions of the streets vacated or discontinued. These words manifestly could not have been intended to include the State or the canal commissioners, because it was clearly the intent of the act that their interests should be conveyed by the deed of the city, and it was not more necessary that the deed should be approved, so far as the State was concerned, than that it should be approved as to the rights of the city. At that time the law of the State had not been definitely and certainly settled in reference to whom the fee of a street which had been platted by a statutory plat would pass upon a vacation of the street. The question was suggested and left undecided by the opinion in *Canal Trustees* v. *Haven, supra,* filed at the June term, 1850, and by the opinion in *Hunter* v. *Middleton,* 13 Ill. 50, filed at the November term, 1851. Such doubt as there was on the subject was not banished earlier than 1874, when the opinion in *St. John* v. *Quitzow, supra,* was delivered. Various leases of the privileges had been made and gave rise to claims of ownership pursuant to their terms. These conditions, as they existed in 1853, were no doubt considered by the legislature in passing the act of 1853 and are not without weight in determining its meaning, the purpose of the legislation being the settlement of conflicting titles. It is true that the first section of that act provides that the provisions of the original act shall apply to such parts of the streets as may be discontinued by virtue of the second act, "as far as the same may be applicable," but the original act could not be held

applicable to the interest of the State in the vacated street after the passage of the act of 1853, because it is clear that the effect of the latter act was to remove from the operation of the first act the right of reverter which the State had in the street. By the first act the deed to be made by the city could not affect the right or interest of the State, and under that act it was provided that in any proceeding brought pursuant to that enactment the State could be made a party, which could not have been done except for that provision. By the second act the city was authorized to convey the right of the State, and it was not provided that in the proceeding in court contemplated by that act the State could be made a party. The conclusion is obvious. The legislature did not intend the State should be made a party to a proceeding looking to the approval of a deed which it had provided should convey any right which it had. We conclude, therefore, that by the act of 1853 the city was authorized to convey the interest which the State would otherwise have had in the vacated streets, and that no order or decree of any court was essential to the passage of the title so far as the State was concerned.

On February 14, 1856, the common council of the city of Chicago passed an ordinance which vacated that portion of the street which included parcel "B," and thereafter, in the same year, conveyed the same to certain persons through whom appellee claims, for a money consideration of a little less than $22,000, no part of which was paid to the State. The persons to whom it was so conveyed were then the owners of lots 4 and 5 in block 7, and in addition to the money paid for parcel "B" they dedicated, through the east side of said lots 4 and 5, a street running north from Carroll street to Kinzie street, which was named Kingsbury street. No question arises in this case growing out of the opening of the new street. The deeds of the city just mentioned were not approved by the circuit court nor were they made pursuant to any order or decree of any court, but, as

above indicated, they were, notwithstanding that fact, sufficient to convey the fee to the city's grantees, from whom it has passed through various conveyances to appellee.

In May, 1857, the city council vacated that portion of Carroll street which included parcel "C" and the portion of Carroll street immediately south thereof. The portion on the south was conveyed to persons owning lots abutting thereon from the south. During the same year parcel "C" was conveyed by the city to the owners of lots abutting thereon from the north, and it is through the latter that appellee claims. It appears from the deed that the purpose of the city in vacating and conveying that portion of Carroll street which is involved in this suit was to secure some concession from the owners of the land which abutted thereon from the north, who were then also the owners of that portion of the south half of block 7 which laid east of Kingsbury street, in reference to narrowing Carroll street east of Kingsbury street. Counsel for the appellant contend that the narrowing of that street east of Kingsbury was an advantage to these owners, and that for this reason they, in fact, paid nothing for parcel "C." Whether that be true we cannot determine from this record, and whether it be true is, in any event, immaterial in this proceeding.

Section 1 of the act, found at page 112, Laws of 1851, provides: "That when the corporate authorities of any city may deem it for the best interest of their respective cities that any street or part of a street shall be changed, altered or vacated, said authorities shall have power, upon petition of the property holders owning property on such street or part of a street to change, alter or vacate the same and to convey by a quit-claim deed all interest which said city may have had in the street or part of street so vacated to the owner or owners of lots and lands next to and adjoining the same, upon the payment by such owner or owners of all assessments which may be made against their lots or lands for and on account of benefits to the same arising

from such change, alteration or vacation of any street or part of street as aforesaid."

Appellee's position is, that the city was by this statute authorized to convey parcel "C" in fee to abutting owners. It is not contended by appellee that this statute could here be regarded as constitutional if the possibility of reversion in Carroll street had been in a private individual instead of in the State, but it is here insisted that the constitutional objection to the statute, which would apparently have authorized the city to convey the interest of a private individual in that street, does not apply to the statute in so far as it authorizes the city to convey the right of reverter possessed by the State, which itself enacts the statute. In *City of Chicago* v. *Rumsey, supra,* it was said that the statute of 1833, which provides for the acknowledgment and recording of plats, shows that it was the policy of the State to vest the fee of the State in cities and towns, and that the fee should be under the paramount control of the legislature for the public use, divested of all claims of private ownership; that such being the declared policy of the State, the presumption obtained that no discrimination in this regard would exist between the cities and towns laid out by the State and those laid out by other proprietors, and that, a general policy being once established, it devolved upon those claiming exceptions to clearly show their existence. Following this reasoning, it would seem clear that when the legislature sought to confer upon the city the right to convey a certain interest in a vacated street to abutting lot owners its purpose was to give that right both where the State itself had been the dedicator and where the city had been platted, pursuant to the statute, by a private individual, and even if the legislature failed, so far as the latter instance was concerned, for constitutional reasons, it would not therefore be defeated in instances where the State itself was the owner of the possibility of reversion. It has been suggested, however, that the statute only authorizes the city to convey "all

interest which said city may have had in the street or part of street so vacated," and that the city was therefore only authorized to convey such interest as remained in it after the street was vacated. If that be true, the city could, of course, convey nothing except where the city itself had been the dedicator, and in that view of the matter the statute would be meaningless, because where the city itself had owned or platted the property the right of reverter in the streets would be in the city, and upon the vacation of the streets the city could convey the vacated street without reference to this statute. The title which the city had the right to convey under that statute was that which it "may have had in the street." The title which it originally had in this street was a fee simple held in trust for public uses, but, undoubtedly, the title which it was designed it should convey was a fee simple title, the trust having been extinguished by the vacation. We think the city was by this statute authorized to convey the fee in parcel "C" to the abutting owners.

By the act of Congress of March 2, 1827, (4 U. S. Stat. at Large, p. 234,) the State was authorized to dispose of the canal lands "for the purpose aforesaid and no other," the purpose aforesaid being to aid in opening a canal. Appellant, as to parcels "B" and "C," takes the position that the lands were held in trust by the State to be used in constructing a canal, and that the State could not rightfully authorize the city to convey the fee in the vacated streets except a consideration for the conveyance passed directly into the canal fund. Counsel for the State by their brief and argument state their position thus: "Under the terms of the act of Congress of March 2, 1827, granting land to the State for a canal, the State could not lawfully donate this land to the city of Chicago or to third persons in the manner disclosed by the evidence herein. If the laws of the State are construed as having such intent they are void, as in conflict with the said act of Congress."

Counsel for appellee have regarded this as a contention that if the State, as a trustee, has authorized the city to convey the realty for a purpose not contemplated by the act of Congress, the State could disregard such a conveyance and recover the land conveyed, in ejectment. Counsel for appellant, by their brief in reply, say this is a misapprehension of their position; that "the contention of appellant with regard to the trust imposed upon the legislature by the act of Congress is, that the obligations of this trust should form a rule of construction of the acts of the legislature rather than a condition upon the title of the State."

While it was the purpose of the State to comply with the spirit of the act of Congress, we cannot disregard statutes passed by our General Assembly which provided for disposition of the canal lands for the benefit of local municipalities, where the purpose of the act of Congress would be indirectly, and not directly, advanced.

By section 12 of the act of February 15, 1831, (Laws of 1831, p. 39,) the canal commissioners were authorized to give a quantity of lots, not exceeding ten acres, in any town on canal land which was or might become a county seat, to aid in the erection of public buildings, and other similar statutes were later passed. The authority so conferred was frequently exercised. In laying out the town of Ottawa, in LaSalle county, the canal commissioners dedicated a block of ground for a public square, and the county commissioners of that county, pursuant to power given by another statute passed in 1831, sold and conveyed a part of this square for the purpose of applying the proceeds to the erection of a court house and jail. Thereafter, in 1841, the legislature passed another act (Laws of 1841, p. 311,) declaring all sales theretofore made by the county commissioners of LaSalle county of any part of the square in question to be good and valid. A complete history of the Ottawa transaction and legislation relating thereto is found

in *Lyman* v. *Gedney,* 114 Ill. 388. The dedication of such public grounds, as well as the dedication of streets, can be justified on the theory that the canal authorities were thereby enabled to obtain for lots and blocks to which, at the time of the dedication, they retained title, a greater aggregate price than they could have obtained for such lots and blocks, together with the property dedicated, had no dedication been made, so that, in fact, the intent of the Congress of the United States, as evidenced by the act of March 2, 1827, was given effect.

It is clear to us from the history of legislation in the State, that during the period when the acts of 1847 and 1853, relative to the wharfing privileges, were passed, it was the policy of the State (1) to encourage the growth of towns and cities on canal lands by donating canal lands for certain public purposes; and (2) to vest the fee of the streets in the town or city, and to give to the town or city, so far as could be done without a violation of constitutional provisions, every right and interest, of every character, in the land in the streets, burdened only with the right of the people to use the same for public ways.

Attention is called by appellant to the fact that letters written by certain of appellee's predecessors in title to canal authorities indicate that such predecessors doubted whether they possessed the entire legal title to parcel "B." These letters are without weight in this controversy. The validity of appellee's title must be determined by the law, and not by any view that may have been entertained by those through whom it passed. We think this record free from error.

The judgment of the circuit court will be affirmed.

*Judgment affirmed.*